Hillsborough
No. 88-484

THE STATE OF NEW HAMPSHIRE

v.

NELSON SANTANA

January 28, 1991

*John P. Arnold,* attorney general (*Clyde R.W. Garrigan,* assistant attorney general, on the brief and orally), for the State.

*James E. Duggan,* chief appellate defender, of Concord, by brief and orally, for the defendant.

BROCK, C.J. The defendant, Nelson Santana, was convicted after trial by jury in the Superior Court (*Dalianis,* J.) of sale of cocaine and possession with intent to sell cocaine, contrary to RSA 318-B:2 (since amended, *see* Supp. 1989). He was sentenced to serve five to ten years, with another five to ten year consecutive sentence suspended. On appeal he claims that the Superior Court (*Mangones,* J.) erred in denying his pretrial motion to suppress evidence discovered in the apartment which the police entered forcibly, without a

warrant, and in which he was arrested. For reasons that follow, we reverse.

The defendant presents two issues for our consideration. He first argues that the police may not rely on "exigent circumstances" to justify a warrantless entry into a home when the police have probable cause and ample opportunity to obtain a search warrant, but when, instead, they decide to take action which they know and expect will present exigency. Second, he claims that the police failed to comply with the "knock and announce" rule, thus making their warrantless entry into the apartment unreasonable under both the New Hampshire and United States Constitutions.

The relevant facts are as follows. On March 9, 1987, the Nashua police received information from a confidential informant that Jerry Davis and Lisa Powers, individuals described as "middlemen between the sellers and the buyers," were involved in drug transactions with an individual known only as a "Dominican male." According to the informant, Davis and Powers were planning a cocaine purchase on the afternoon of March 11. Based on this information, Detective James Brackett of the Nashua Police Department initiated surveillance of Davis and Powers to determine the source of the cocaine. On March 11, the police followed Davis and Powers from their residence to an apartment building located at 80 Cypress Lane in Nashua. Davis entered the building and remained inside for approximately five minutes. He and Powers then drove directly home. Later that day, the informant gave Detective Brackett a small amount of cocaine which, according to the informant, had come from Ronald Martin, who had received it from Jerry Davis.

Detective Brackett then contacted the owner of the apartment building at 80 Cypress Lane to determine whether there were any Dominican or hispanic tenants in the building. The owner related that an hispanic family, Ernesto and Rosa Santana, lived in apartment 12. Earlier, in February, the Nashua police had received information during another narcotics investigation that Ernesto Santana had acquired a firearm. The building owner told the detective that he had received complaints about the high levels of foot traffic and noise from the Santanas' apartment.

On receiving this information, the police began undercover surveillance at 80 Cypress Lane. On March 12 and 13, police officers, posing as painters, observed the daily activities outside apartment 12. During this period, the police saw Jerry Davis enter apartment 12, "stay a short time and leave." Another individual previously iden-

tified by the police as an "illicit drug trafficker" also came to apartment 12 and left.

On March 22, the informant told Detective Brackett that Davis and Powers had again visited the apartment building at 80 Cypress Lane and that sometime later Davis had made a cocaine sale. Additionally, the informant related that a shipment of cocaine was to arrive sometime on March 23 or 24 and that Davis and Powers were planning to pick up some cocaine from the apartment building on March 24. Armed with this information, Detective Brackett asked the informant to arrange the purchase of a pound of cocaine. The informant complied, arranging to buy the cocaine on the afternoon of March 24. The informant told the detective that the dealers required that the transaction be separated into two half-pound transfers. As envisioned by the dealers, Davis and Powers would bring $9,000 to the apartment building, exchange the money for drugs, return to their home, be given another $9,000 and again drive to 80 Cypress Lane to purchase the second half-pound. Detective Brackett, however, never intended to allow the second half of the exchange to take place.

Between March 22 and March 24, several significant events took place. First, while the deal, as arranged, involved the exchange of a pound of cocaine for $18,000 in two equally divided transfers, Detective Brackett only obtained $9,000 from the attorney general's office. (In the "Order on Motion to Suppress," the trial court in its findings of fact stated that Detective Brackett received $18,000. This finding, however, is clearly erroneous based on the record of the suppression hearing and the State's admission in its brief before this court.)

Second, on March 23, a full day before the forced entry into apartment 12, the police filled out a search warrant application and completed nine of twelve paragraphs of a supporting affidavit. It was not until after the police had entered apartment 12 on March 24 that the remaining three paragraphs were added to the affidavit, and the application was submitted to a judge for review.

Finally, prior to the events on March 24, Detective Brackett gathered a "special reaction team" (hereinafter SRT), comprised of ten to twelve officers. The SRT was specially trained for conducting raids when there was a need to ensure quick and safe entry into a building and to secure its occupants. During these raids the team was heavily armed and equipped with a "Kelly ball," a device used for breaking open locked or closed doors. Detective Brackett requested the SRT's assistance for a planned raid on apartment 12 on March 24 and spe-

cifically instructed them to use the "Kelly ball" to gain entry into the apartment. He also told them not to conduct a search once inside the apartment, but to secure the premises and await the arrival of the search warrant.

On March 24, the police gave the $9,000 to the informant, who, in turn, gave the cash to Ronald Martin, the informant's contact with both Davis and Powers. Martin took the money to Davis and Powers, who left their home and went to 80 Cypress Lane. The police observed Davis enter apartment 12, at which point the SRT took up a position closer to the apartment. Detective Brackett told the leader of the SRT "to grab Jerry [Davis] when he comes out."

About five or six minutes later, Davis emerged from the apartment. Davis moved only a few feet from the apartment door before he was stopped by the police. In his jacket pocket the officers found a package of cocaine. Once Davis was arrested, Detective Brackett ordered the SRT to enter the apartment and to secure it. A member of the SRT swung the "Kelly ball" at the door, breaking it open, and the team entered apartment 12 with their guns drawn.

Once inside, the police found Rosa Santana and a young girl in the living room, and the defendant and another individual, Rumardo Sanchez, hiding in a bedroom closet. Also in the bedroom, in plain view, the officers saw a "large amount of cocaine" and a scale on a dresser top, and "piles of cash" on the bed. The police arrested Sanchez and the defendant, handcuffed them, and placed them on the floor of the apartment.

On securing the apartment, the police did not seize any evidence but waited there while an officer at the police station completed paragraphs ten through twelve of the search warrant affidavit. The application and affidavit were then presented to a district court judge who was on call, and the search warrant was issued. The warrant was immediately executed, and the police seized $8,300 of the cash provided by the police, an additional $10,000 in cash, two pounds of cocaine and various other items of drug paraphernalia.

The defendant was indicted by a Hillsborough County Grand Jury for possession of cocaine, possession with intent to sell, and sale of cocaine. *See* RSA 318-B:2 (since amended, Supp. 1989). His pre-trial motion to suppress the evidence seized in apartment 12 was denied, and he was convicted after a three-day trial.

I. *Availability of Exigency Exception to the Warrant Requirement*

The defendant argues that the police had probable cause and ample opportunity to obtain a search warrant for apartment 12, but

that, instead of obtaining a warrant, they wrongfully chose to create exigency to justify their entry into the apartment. He argues that, under these circumstances, the failure to obtain a warrant requires suppression of the seized evidence because the search violated part I, article 19 of the New Hampshire Constitution and the fourth amendment to the United States Constitution. When presented with such a claim, we look first to the New Hampshire Constitution, and only to the extent that the Federal Constitution provides greater protection than our State Constitution will we consider the defendant's federal constitutional issues. *State v. Turmelle*, 132 N.H. 148, 152, 562 A.2d 196, 198 (1989) (citing *State v. Ball*, 124 N.H. 226, 231–32, 471 A.2d 347, 350–51 (1983)). *But cf. State v. King*, 131 N.H. 173, 176, 551 A.2d 973, 975 (1988).

■■ The beginning point of our analysis is the text of the New Hampshire Constitution. Part I, article 19 provides that "[e]very subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions." From this provision come two indisputable and bedrock principles. First, warrantless entries are *"per se* unreasonable" and illegal, unless the entry is made pursuant to one of a few recognized exceptions. *Theodosopoulos*, 119 N.H. 573, 578, 409 A.2d 1134, 1137 (1979), *cert. denied*, 446 U.S. 983 (1980). Second, when the entry is made into an individual's private dwelling, where there exists a "strong expectation of privacy and protection from government intrusion," the requirement of a warrant is "particularly stringent." *Theodosopoulos*, 119 N.H. at 580, 409 A.2d at 1138. To have it otherwise "would [be to] obliterate one of the most fundamental distinctions between our form of government, where officers are under the law, and the police-state where they are the law." *Johnson v. United States*, 333 U.S. 10, 17 (1948), *quoted in State v. Beede*, 119 N.H. 620, 628, 406 A.2d 125, 131 (1979), *cert. denied*, 445 U.S. 967 (1980).

■ One exception to the warrant requirement that is clearly established, but whose boundaries are not as clearly defined, is the exigent circumstances plus probable cause exception. *See Theodosopoulos*, 119 N.H. at 578, 409 A.2d at 1137; 2 W. LaFave, Search and Seizure § 6.5(b), at 657 (2d ed. 1987). Exigent circumstances exist when the delay entailed by the obtaining of a search warrant would create a "substantial threat of imminent danger to life or public safety," *Theodosopoulos*, 119 N.H. at 578, 409 A.2d at 1139, or there is a likelihood that evidence will be destroyed, *State v. Wong*, 125 N.H. 610, 630, 486 A.2d 262, 274 (1984). Decisions on the

applicability of this exception depend on the facts of a particular case and require caution, "for it is an exception which by its nature can very easily swallow the rule unless applied in only restricted circumstances." *Commonwealth v. Conn.*, 547 A.2d 768, 770 (Pa. 1988) (quoting *Commonwealth v. Daniels*, 421 A.2d 721, 725 (Pa. 1980)).

■■ The question of whether adequate exigency exists is one of fact, and the decision will be left undisturbed unless found to be clearly erroneous. *State v. MacDonald*, 129 N.H. 13, 21, 523 A.2d 35, 39 (1986). Moreover, no single factor controls our inquiry, but we look to the totality of the circumstances, which includes an examination of "'the overall reasonableness'" of the police officers' behavior prior to the entry. *Id.* (quoting *United States v. Campbell*, 581 F.2d 22, 25 (2d Cir. 1978)). During this examination we do not consider the evidence discovered as a result of the entry, *Theodosopoulos*, 119 N.H. at 579, 409 A.2d at 1138, because to do so would legitimize any search as long as it ultimately revealed evidence of illegality. *See United States v. Impink*, 728 F.2d 1228, 1231–32 (9th Cir. 1984) (applying this standard to review of probable cause determination).

Although the gravamen of the defendant's argument lies elsewhere, we first consider whether the trial court erred in its determination that sufficient exigency existed to justify a warrantless entry. We agree with the State that at the point Jerry Davis was grabbed by the police outside of apartment 12 there existed conditions presenting a "compelling need for immediate official action." *See Theodosopoulos*, 119 N.H. at 580, 409 A.2d at 1138–39. As the trial court correctly found in its order on the motion to suppress:

> "Drugs and currency were reasonably believed to be inside [the apartment]. While the Fourth Amendment and Part I, Article 19 are not relaxed for drug investigations, the ease of destruction of that evidence sets the framework for the determination of exigent circumstances. This case involved a bifurcated drug deal; the second one-half pound was to be exchanged one-half hour after the first. If Davis were arrested and no one returned for the second transaction, a reasonable conclusion would be that the supplier of the drugs would be "spooked" and the evidence might be disposed of or concealed. *See United States v. Wulferdinger*, 782 F.2d 1473 (9th Cir. 1986) (arrestee expected to return in one hour) and *United States v. Moore*, 790 F.2d 13 (1st Cir. 1986)."

*Accord United States v. Altman*, 797 F.2d 514 (7th Cir. 1986).

 The primary focus of our inquiry, however, is not on the *sufficiency* of the exigency but rather how the exigency came about. The police may not create exigency in order to justify their warrantless entry, *see Theodosopoulos*, 119 N.H. at 581, 409 A.2d at 1139–40; *accord United States v. Curzi*, 867 F.2d 36, 42 (1st Cir. 1989), yet the boundary between an exigency which naturally arises and an exigency which is created is unclear. There are several factors, however, which serve to guide us.

Certainly "the presence or absence of an ample opportunity for getting a search warrant" is pertinent to our inquiry. *United States v. Rabinowitz*, 339 U.S. 56, 84 (1950) (Frankfurter, J., dissenting), *quoted in Theodosopoulos*, 119 N.H. at 581, 409 A.2d at 1139. Implicit in this consideration is an acknowledgment that an officer does not have to obtain a search warrant at the point probable cause is established. *Id.* Likewise, an officer's failure to avail himself of an early opportunity to obtain a warrant will not automatically preclude him from relying on exigent circumstances. *Cardwell v. Lewis*, 417 U.S. 583, 595 (1974).

Neither party disputes that by March 22, two days before the raid on apartment 12, the police had received enough information to establish probable cause for a search of the apartment. Moreover, the defendant does not argue that, because probable cause existed two days before the raid, the police were required to obtain a search warrant. Rather, he asserts that a warrant was required when the police, with probable cause and time to obtain a warrant, took action which they knew would result in a "compelling need for immediate official action." *See MacDonald*, 129 N.H. at 20, 523 A.2d at 38. The State responds simply that "unforseeability [sic] of exigent circumstances is not an element of the exigent circumstances exception to the warrant requirement."

We take guidance on the issue of foreseeability from a recent First Circuit Court of Appeals case, *United States v. Beltran*, 917 F.2d 641 (1st Cir. 1990). In that case, the police received information from a confidential informant that the defendant was selling cocaine from her apartment. Consequently, the police asked that the informant arrange a drug purchase, and on October 23, 1989, they observed the defendant sell cocaine to the informant. Based on these observations, the police decided to set up a second purchase on the following day, and at 4:20 p.m. on October 24, the informant and the defendant agreed to meet at the defendant's apartment that night at 7:30 p.m. for the transaction. At the appointed time, the informant went to the

apartment, observed the cocaine, and signaled the awaiting officers, who, without a warrant, entered the defendant's apartment and arrested the defendant. The police then obtained a warrant to search the apartment. *Id.* at 642.

The court agreed with the federal district court that the government's claim of exigency was inadequate to support the warrantless entry. *Id.* at 643. In reaching its decision the court noted,

> "we are *not* saying that police officers must apply for an arrest warrant the instant they have 'probable cause.' (Citation omitted.) . . . Our cases make clear, however, that where the police fully expect that they may have to enter a home to make an arrest in the near future, and when they have more than enough time and knowledge to secure a warrant, they must do so. (Citations omitted) . . . To repeat, in this case, three or four hours before the police arrested Ms. Beltran, they knew that they were likely to do so, they had an adequate basis for obtaining a warrant, and they could have obtained one. Therefore the warrantless arrest violated the Fourth Amendment"

*Id.* at 643 (emphasis in original).

■ ■ Accordingly, we disagree with the State's position that foreseeability of the exigency by the police is not a factor for our consideration. When reviewing the totality of the circumstances, we consider the degree to which the exigency relied upon by the State was foreseeable. *See Commonwealth v. Forde*, 367 Mass. 798, 803, 329 N.E.2d 717, 720 (1975). We stress, however, that the extent to which "exigency was foreseeable at the time the decision was made to forego or postpone obtaining a warrant does not, by itself, control the legality of a subsequent warrantless search triggered by that exigency." *United States v. Webster*, 750 F.2d 307, 327 (5th Cir. 1984), *cert. denied*, 471 U.S. 1106 (1985).

In the case at bar, however, as in *United States v. Beltran*, 917 F.2d 641, the exigency was not just foreseeable but was the *expected* result of the planned drug buy. The facts clearly show that Detective Brackett understood from the beginning that under his plan an emergency situation would arise requiring the police to enter the apartment. While Detective Brackett did not initially plan for a two-part drug buy, once that part of the transaction was set, he dictated how the events on March 24 would occur.

There can be no dispute that the second half of this drug sale was never intended to take place. Detective Brackett withdrew only half

of the full amount of cash needed for the complete transaction, and he testified at the suppression hearing that he never intended to allow Davis to return home for the second half of the exchange. Once the detective made the decision to allow only half of the exchange to take place, he realized that this created a need to enter the apartment quickly in order to secure it and the evidence inside. Thus, before setting his plan into action, he gathered the SRT and specifically instructed them to use the "Kelly ball" in order to gain entry into the apartment and secure the premises.

Furthermore, this was not a case where the police were attempting to obtain a search warrant when the exigency interceded and required that the police take immediate action. *See Webster*, 750 F.2d at 328. Detective Brackett, a day before the entry, had prepared the search warrant application and completed all but the last three paragraphs of the affidavit. Instead of seeking the warrant at that time, the detective decided to wait until Jerry Davis had been arrested and entry had been made into the apartment before doing so.

■■ Under these circumstances, where the police, with ample probable cause, time to obtain a warrant, and time for reflection, choose to pursue a course of action which they know at the outset will present a situation requiring an emergency entrance into a person's home, we hold that they should obtain a warrant and that they may not rely on the expected exigency to justify their entry. *See United States v. Beltran*, 917 F.2d at 643; *accord United States v. Curzi*, 867 F.2d at 42–43; *United States v. Munoz-Guerra*, 788 F.2d 295, 298 (5th Cir. 1986); *United States v. Morgan*, 743 F.2d 1158, 1163 (6th Cir. 1984), *cert. denied*, 471 U.S. 1061 (1985).

II. *Preservation of the Independent Source Issue*

The State also argues, for the first time on appeal, that even if the warrantless entry was unconstitutional, the evidence seized should not be suppressed because its seizure was based, not on the warrantless entry, but on a search warrant untainted by the entry. This is known as the "independent source doctrine," established in the federal system, *see Segura v. United States*, 468 U.S. 796 (1984), and recognized in New Hampshire, *see State v. Holler*, 123 N.H. 195, 459 A.2d 1143 (1983). However, before we can address the merits of the State's position, we must determine whether the State was required to preserve this issue below.

■ It is unquestioned that, for this court to consider an issue on appeal, it must have been raised "by exception, objection or motion

in the trial court." *State v. Desmond*, 125 N.H. 448, 448, 480 A.2d 208, 209 (1984). This applies equally to issues of constitutional import. *Weldy v. Town of Kingston*, 128 N.H. 325, 334–35, 514 A.2d 1257, 1262–63 (1986). We have said that this requirement is "grounded in common sense and judicial economy," *State v. Johnson*, 130 N.H. 578, 587, 547 A.2d 213, 218 (1988), in that it gives the trial court, as factfinder, an opportunity to make a determination of the issue. *Weldy, supra* at 335, 514 A.2d at 1263.

We are called upon to examine a heretofore unexplored branch of the preservation requirement in New Hampshire and determine whether the State, during suppression proceedings, must raise and preserve alternative grounds for the admission of evidence claimed to have been unconstitutionally seized, in addition to the arguments upon which it ultimately prevailed below, in order for this court to consider those grounds on appeal.

Some guidance on this issue is gained from federal case law. In *Steagald v. United States*, 451 U.S. 204 (1981), the defendant unsuccessfully argued before the district and circuit courts that the police were required to obtain a search warrant prior to entering his home for the purpose of arresting someone else. Before the United States Supreme Court, the prosecution for the first time argued that the defendant lacked standing to challenge the search. *Id.* at 208. The Court, however, refused to consider the standing argument:

> "Aside from arguing that a search warrant was not constitutionally required, the Government was initially entitled to defend against petitioner's charge of an unlawful search by asserting that petitioner lacked a reasonable expectation of privacy in the searched home. . . . The Government, however, may lose its right to raise factual issues of this sort before this Court when it has made contrary assertions in the courts below, when it has acquiesced in contrary findings by those courts, or *when it has failed to raise such questions in a timely fashion during the litigation*."

*Id.* at 209 (emphasis added); *accord United States v. Persico*, 832 F.2d 705, 714–15 n.2 (2d Cir. 1987), *cert. denied*, 486 U.S. 1022 (1988); *United States v. Thompson*, 710 F.2d 1500, 1503–04 (11th Cir. 1983), *cert. denied*, 464 U.S. 1050 (1984); *United States v. Sanchez*, 689 F.2d 508, 509 n.1 (5th Cir. 1982).

 This analysis is compelling in view of the fact that the State carries "the burden of proving by a preponderance of the evidence that a warrantless search was constitutionally permissible,"

*State v. Theodosopoulos,* 119 N.H. at 578, 409 A.2d at 1137. Moreover, as factfinder, the trial court must determine, based on the grounds identified by the State, whether the facts presented are sufficient to meet the State's burden. The trial court's findings are reviewed narrowly on appeal and will be overturned only if unsupported by the record or found to be clearly erroneous. *See N.H. Bituminous Co., Inc. v. TAB Aviation, Inc.,* 132 N.H. 38, 41, 566 A.2d 153, 155 (1989); *State v. Jones,* 131 N.H. 726, 728, 560 A.2d 1159, 1160 (1989). Because of the evidentiary burden on the State and the deference given to the trial court's determinations, we will not consider an issue which the trial court did not have the opportunity to address below.

In the case at bar, the State never identified for the trial court the "independent source doctrine" as a ground justifying the admission of the evidence. Consequently, the defendant and the trial court never had the opportunity to consider that legal issue or the development of facts that might or might not have supported that argument. Without such consideration, we will not address the issue on appeal.

Because the illegal warrantless entry requires suppression of the evidence, we need not reach the defendant's knock and announce issue.

*Reversed and remanded.*

HORTON, J., did not sit; the others concurred.