534 F.Supp.2d 217 (2008)
UNITED STATES of America
v.
Marc[1] JADLOWE, et al.
Criminal No. 05-10306-RGS.
United States District Court, D. Massachusetts.
February 22, 2008.
*218 William H. Connolly, Ann Taylor, Jennifer Hay Zacks, United States Attorney's Office, Boston, MA, for Plaintiff United States of America.
D. Christopher Dearborn, James L. Sultan, Rankin & Sultan, Boston, MA, for Defendant Mark Jadlowe.
E. Peter Parker, Law Office of E. Peter Parker, Boston, MA, for Thomas. Jadlowe.
FINDINGS OF FACT, MEMORANDUM OF LAW, AND ORDER ON VARIOUS DEFENDANTS' MOTIONS TO SUPPRESS
STEARNS, District Judge.
Based on the credible evidence, the court makes the following findings of fact.
1. In August of 2005, a task force consisting of agents of the Drug Enforcement Administration (DEA) and New Bedford police officers began court-ordered electronic surveillance of Brandin Gonsalves, a reputed New Bedford area drug trafficker. Among those intercepted was defendant Marc Jadlowe.[2]
2. The surveillance revealed a plan by Gonsalves and his confederates to distribute ten kilograms of cocaine purchased from Mexican suppliers.
3. In October of 2005, preparations began for the delivery of the drugs. Jadlowe, who owned two homes (one unfinished) at 30 and 30R Arch Street in Dartmouth, Massachusetts, had offered his property as a terminus for the delivery. On October 8, 2005, Gonsalves spoke to Jadlowe about obtaining a generator to *219 supply electricity and light to the unfinished home. Gonsalves told Jadlowe that the shipment was expected in "a couple [of] days."
4. The shipment did not arrive, apparently because of the arrest of one of the Mexican couriers. Contact with the Mexican suppliers was resumed at the beginning of November. During the interval, the intended way station for the drugs shifted from the empty house at the back of Jadlowe's lot to the garage next to his dwelling. On November 3, 2005, John Ferreira, one of Gonsalves's associates, received a call from an unidentified male stating that the drugs would arrive the next day.
5. On November 4, 2005, at 1:32 p.m., Jadlowe called Ferreira to ask whether he should begin cleaning out the garage in order to make room for the "thing." A few minutes later, Gonsalves telephoned Ferreira to tell him that the drugs had not yet arrived, but when they did, "they would do it at Mares" (Jadlowe's), At approximately 2:40 p.m., during a call placed by Jadlowe, Gonsalves asked if he was done as "they" would be arriving "any time now." Jadlowe said that he was finished and that the truck should fit inside without a problem. A few minutes later, Ferreira called Jadlowe who told him that he had left the garage doors unlocked and had opened the back window to let in light.
6. At approximately 3:47 p.m., agents surveilling 30 Arch Street observed a tan Acura driven by defendant Kenneth Amaral and a white Ford Explorer Sport Truck driven by defendant Robert Rogers arrive at Jadlowe's residence. Amaral and Rogers parked the Explorer in the garage and closed the door. A few minutes later, Ferreira telephoned Jadlowe to complain about the lack of light. Jadlowe asked if "they" were in the garage. When Ferreira replied yes, Jadlowe told him to tell "them" to take the paper off the door. At 4:31 p.m., Rogers drove the Explorer out of the garage. Amaral returned to the Acura. Both men then drove away from Arch Street. Ferreira immediately contacted Jadlowe who confirmed that the Explorer had just pulled away.
7. After following Amaral to his residence, Rogers proceeded northbound on Route 18 in New Bedford. A few minutes later, he was pulled over by a Massachusetts state trooper (ostensibly) for a civil motor vehicle violation.[3] Ferreira, who appears to have been following Rogers, observed the stop. Ferreira immediately called defendant Craig Andrade to tell him that the drugs had to be moved. Andrade offered his home as a hiding place, but Ferreira declined as Andrade was leaving for Florida the following day. At 5:30 p.m., Ferreira called Gonsalves to tell him that Jadlowe was going to move the cocaine from the garage to the unfinished house. Almost simultaneously, Jadlowe was seen by surveilling agents entering the garage. The agents drove onto the *220 property and arrested Jadlowe as he emerged from a door to the garage. During a search incident to arrest, Jadlowe's cell phone was seized from his person.[4] Agents undertook to secure the garage, the doors of which had been left open. As they did so, Andrew Simmons, a New Bedford police detective and task force member, observed ten brick-like packages wrapped in brown paper stacked on a pile of sheet rock in a bay at the rear of the garage. In Simmons's opinion, the shape of each package was consistent with the size of a kilogram of cocaine. Simmons related his observation and opinion in the search warrant affidavit.
8. Ferreira, sensing something amiss, called Gonsalves to tell him that he could not reach Jadlowe and that he intended to drive by 30 Arch Street to investigate. At 5:52 p.m., Ferreira called Gonsalves to report that he had learned from a neighbor that Jadlowe had been arrested.
9. Agents remained inside the garage overnight with the drugs. A warrant was issued by Magistrate Judge Alexander at 11:05 a.m. the following morning. As the agents waited in the garage, they rearranged some furniture to make themselves more comfortable. They did not move or attempt to open the packages. When the warrant arrived, the agents found that the packages (not surprisingly) contained ten kilograms of cocaine.[5]

DISCUSSION
Jadlowe's original motion to suppress conceded probable cause for the search of the garage and challenged only the search of his residence. In light of the government's concession, see footnote 5, the original motion will be ALLOWED. In a post-hearing memorandum, Jadlowe expanded the original motion to suppress (without objection from the government) to include the cocaine seized from the garage. Jadlowe argues that neither of the two exceptions to the Fourth Amendment's warrant requirement posited by the government  the "protective sweep" rule of Maryland v. Buie, 494 U.S. 325, 337, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), nor exigent circumstances, see Roaden v. Kentucky, 413 U.S. 496, 505, 93 S.Ct. 2796, 37 L.Ed.2d 757 (1973)  justified the agents' entry of the garage without a warrant. Nor, having illegally entered the garage, could the agents rely on the independent source/inevitable discovery rule of Murray v. United States, 487 U.S. 533, 541-542, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988), as there is no assurance that had the agents not observed what they believed to be cocaine, they would have "inevitably" sought a search warrant for the garage. See United States v. Dessesaure, 429 F.3d 359 (1st Cir.2005).[6]
*221 The Buie rule permits police to conduct a warrantless "sweep" search of a premises if they possess "a reasonable lief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those am the arrest scene." Id., 494 U.S. at 337, 110 S.Ct. 1093. However, a Buie search "may extend only to a cursory inspection of those spaces where a person may be found," and may last "no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." Id. at 335-336, 110 S.Ct. 1093. See also United States v. Bowdach, 561 F.2d 1160, 1168 (5th Cir.1977) ("[T]he purpose of this cursory search is to check for persons, not things."). The searching officers must have a reasonable basis for their belief that a dangerous individual is concealed on the premises. See United States v. Paradis, 351 F.3d 21, 29 (1st Cir.2003) (sweep of a residence unreasonable where suspect was in custody and officers had no reason to believe that any accomplice was present). Here, the task force agents had 30 Arch Street under close physical surveillance and were contemporaneously monitoring the conversations of the defendants. From the midafternoon of November 4th on, the agents were able at any given moment to account for the whereabouts' of each of the defendants. As a result, they had no reason to believe that anyone other than Jadlowe was anywhere near the Arch Street garage.
The existence of exigent circumstances is also an open question. There is a valid argument to be made that by initiating the pretextual arrest of Rogers,[7] the agents, in effect, created their own exigency. The weight of the cases is reasonably firm in rejecting claims of exigency where "the police, with ample probable cause, time to obtain a warrant, and time for reflection, chose to pursue a course of action which they know at the outset will present a situation requiring an emergency entrance into a person's home. . . ." 3 Wayne R. LaFave, Search and Seizure, § 6.5(b), at 403 (4th ed. 2004), quoting State v. Santana, 133 N.H. 798, 586 A.2d 77, 83 (1991). See also Niro v. United States, 388 F.2d 535, 540 (1st Cir.1968) ("deliberate and unreasonable delay"); United States v. Beltran, 917 F.2d 641, 642-643 (1st Cir. 1990) (police had probable cause and control of the timing of the drug purchase); United States v. Allard, 634 F.2d 1182, 1187 (9th Cir.1980) (illegality calculated to provoke an exigency); United States v. Coles, 437 F.3d 361, 370-371 (3d Cir.2006) (police created the exigency by gratuitously making their presence known). Moreover, it is not clear that an exigency, in the sense of a true threat that the evidence would be moved or destroyed, existed at all. The only immediate peril was posed by Jadlowe, who would not likely have entered the garage but for the call from *222 Ferreira reporting the stop of Rogers. Any contingent threat posed by Jadlowe could have been neutralized (as it was) by his arrest.
As a general proposition, the securing of a dwelling on the basis of probable cause to prevent the destruction or removal of evidence while a warrant, is being sought is not an unreasonable seizure of either the dwelling or its contents. See Illinois v. McArthur, 531 U.S. 326, 334, 121 S.Ct. 946, 148 L.Ed.2d 838 (2001) ("We have found no case in which this Court has held unlawful a temporary seizure that was supported by probable cause and was designed to prevent the loss of evidence while the police diligently obtained a warrant in a reasonable period of time."). The earliest and most explicit statement of the doctrine can be found in Segura v. United States, 468 U.S. 796, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), where. Chief Justice Burger opined that the invasion of a possessory interest (a seizure) is, as a constitutional matter, less intrusive than the invasion of a privacy interest (a search). Id. at 806, 104 S.Ct. 3380. While most of the Justices did not subscribe to this distinction, a majority did agree that an illegal entry to secure a premises was irrelevant to the admissibility of challenged evidence where the illegality was "cured" by a subsequent warrant based on information obtained from sources "wholly unconnected" to the unlawful entry. Id. at 813-814, 104 S.Ct. 3380. See also Murray, 487 U.S. at 543, 108 S.Ct. 2529. The cases, however, distinguish between the securing of a premises from its perimeter, which does not require exigent circumstances, and the impounding of a premises by occupying it from the inside, which does. See LaFave, supra, § 6.5(c), at 422 ("All members of the, [Segura] court also appear[ed] to accept the proposition that a search (i.e., entry) of the premises to facilitate the impoundment requires both probable cause and exigent circumstances.").
Assuming for the sake of argument that an illegal entry of the garage was the "but for" cause leading to the seizure of the cocaine, it does not follow that the cocaine "automatically become[s] `sacred and inaccessible.'" Nix v. Williams, 467 U.S. 431, 441, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984). If the government can show that evidence was obtained by independent means untainted by any prior illegality, the purpose of the exclusionary rule as a deterrent to police misconduct is not compromised by admitting the evidence at trial. Silverthorne Lumber Co. v. United States, 251. U.S. 385, 392, 40 S.Ct. 182, 64 L.Ed. 319 (1920).
The "inevitable discovery" doctrine was first articulated in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).[8] In Brewer, the defendant agreed to lead police to the spot where he had disposed of the victim's body. That fact was suppressed because of a violation of Brewer's Sixth Amendment rights. Justice Stewart, however, suggested that "evidence of where the body was found and of its condition might well be admissible on the theory that the body would have been discovered in any event. . . ." Id. at 406-407 n. 12, 97 S.Ct. 1232.
Justice Stewart's suggestion was adopted in Nix v. Williams. Drawing on *223 the independent source rule, Chief Justice Burger, the author of the Nix opinion, opined "that the interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in . . . if no police error or misconduct had occurred. . . . If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . [here the carefully planned and intensive search by volunteers seeking the little girl's body] . . . then the deterrence rationale has so little basis that the evidence should be received." Id., 461 U.S. at 443-444, 103 S.Ct. 1933. Cf. United States v. Rogers, 102 F.3d 641, 646 (1st Cir.1996) ("The term inevitable, although part of the Nix doctrine's name, is something of an overstatement. The facts of Nix itself . . . show that what is required is a high probability that the evidence would have been discovered by lawful means.").
Nix left open the issue of whether the alternative line of investigation must be set in motion at the time the illegality occurs. Some courts have imposed an "ongoing alternative" requirement where the theory of inevitability rests solely on discretionary police conduct. See United States v. Cherry, 759 F.2d 1196, 1205-1206 (5th Cir.1985) (prosecution must fairly demonstrate "both a reasonable probability that the evidence would have been discovered in the absence of police misconduct and that the government was actively pursuing a substantial alternate line of investigation at the time of the constitutional violation."). Compare United States v. Silvestri, 787 F.2d 736, 745-746 (1st Cir.1986) (rejecting the Cherry rule as "too rigid"); United States v. Boatwright, 822 F.2d 862, 864-865 (9th Cir.1987) (same, the doctrine requires only that "the fact or likelihood that makes discovery inevitable arise from circumstances other than those disclosed by the illegal search itself."). Here, there can be no doubt but that a warrant would have been sought even had the agents not observed the packages of cocaine in the garage. Too much evidence had been gathered and too much corroborating conduct on the part of the defendants had been observed for agents to simply take the chance that what was delivered by Rogers and Amaral to the garage at 30 Arch Street was some innocent commodity.[9]
Recognizing the force of Segura and Murray, Jadlowe relies on an Eighth Circuit decision, United States v. Madrid, 152 F.3d 1034, 1040-1041 (8th Cir.1998), which holds that the inevitable discovery rule should not be applied when a constitutional violation is particularly egregious. In Madrid, agents of a DEA task force, acting on a cooperating witness's statement that he had purchased methamphetamine at Madrid's home, went immediately to the home and secured it from the inside. The agents detained five occupants (one of whom was a fifteen-year old girl), searched the men, took their pictures, and emptied their wallets. While waiting for a warrant to arrive, the agents searched the upstairs of the home and the basement. They also perused mail, personal documents, and a journal found on the premises. While agreeing that the decision to seek a warrant was not influenced by anything that *224 the agents had seen while inside the home, the Eighth Circuit reversed the district court's denial of Madrid's motion to suppress.
[T]he Fourth Amendment's warrant requirement can effectively serve its deterrent function only if police officers may not, constitutionally search a residence, hold its occupants hostage, and, in short, exploit their presence simply because the warrant application process has begun. Whatever balance is to be achieved by the inevitable discovery doctrine, it cannot be that police officers may violate constitutional rights the moment they have probable cause to obtain a search warrant.
The government's intrusion in this case far exceeds that in either Segura or Murray, and we do not read those cases as requiring the application of the inevitable discovery doctrine without regard to the severity of the police misconduct. In fact, the only way we can effectuate the warrant requirement's deterrent function is to decline to extend the application of the inevitable discovery to the facts of this case.
Id. at 1040-1041.
This case simply does not resemble Madrid. There was no egregious or gratuitously excessive conduct on the part of agents during the occupation of the garage. There was no rummaging, prying, or superfluous detention of any occupants, nor is there evidence that agents entered any building other than the garage prior to the arrival of the warrant. As in Murray, the evidence was left undisturbed. The most that agents did that might be said to have compromised the crime scene was to rearrange some furniture to make themselves more comfortable. While the more appropriate course would have been to secure the garage from the perimeter, the court perceives no compromise (and Jadlowe suggests none) of the integrity of the evidence that could be attributed to the agents' conduct.

ORDER
For the foregoing reasons, the motions of defendants Jadlowe, Rogers, Ferreira, and Gonsalves to suppress the cocaine are DENIED. Jadlowe's motion to suppress the cell phone seized from his person is also DENIED. Jadlowe's motion to suppress the items seized from his home at 30 Arch Street is ALLOWED. Ferreira's motion to suppress the contents of the computer seized from his home at 80 Sagamore Street is also ALLOWED.
SO ORDERED.
NOTES
[1] Jadlowe's first name is mistakenly spelled as "Mark" in the caption of the indictment.
[2] Defendant Robert Rogers on October 31, 2007, moved to join Jadlowe's motion. Defendants Brandin Gonsalves and John Ferreira filed separate motions to suppress based on the arguments advanced by Jadlowe. Because the affidavits offered by the latter two defendants fail to recite any facts establishing an expectation of privacy in Jadlowe's dwelling(s) or garage, their motions will be DENIED. See Minnesota v. Carter, 525 U.S. 83, 89-90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998). Cf. United States v. Torres, 162 F.3d 6, 10 and n. 1 (1st Cir.1998). Rogers filed no affidavit at all. Consequently, his vicarious motion to suppress will also be DENIED. The court, however, notes that the same showing of probable cause that dooms Jadlowe's motion pertains to these defendants as well.
[3] Rogers was cited for the improper display of a temporary license plate. Rogers challenges the ensuing "inventory" search of his vehicle, arguing that the citation was based on a mistake of law, namely the license display requirements of the New Mexico Traffic Law (the vehicle was registered in New Mexico), and that the stop was therefore not justified. This may or may not be true, but it is essentially irrelevant. At the time of the stop, police had probable cause not only to arrest Rogers, but also to search the Explorer and "every part of the vehicle and its contents that [might] conceal the object of the search." United States v. Ross, 456 U.S. 798, 825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982). The lack of actual knowledge of the facts giving rise to probable cause on the part of the officer who conducted the stop is also irrelevant. See United States v. Cello, 945 F.2d 180, 183-184 (7th Cir.1991). Because this aspect of Rogers's motion raises no viable issues of fact or law, it will be DENIED without further analysis.
[4] Jadlowe correctly asserts that Lt. Robert Andrade, the arresting officer, testified that he did not remember taking the cell phone from Jadlowe during the search. (More precisely, he testified that he recalled the cell phone being at the scene, but not necessarily being found on Jadlowe). DEA agent Michael Berbuti, whose version of the search I credit, testified that Lt. Andrade took the phone from Jadlowe during the search and handed it to him for safekeeping. I also note that Jadlowe's motion to suppress and his affidavit specifically reference a cell phone seized from his person.
[5] The warrant also authorized a search of Jadlowe's home. Agents seized .22 caliber ammunition, telephone records, a scale, and quantities of narcotic pills and marihuana. The government concedes that these items must be suppressed as the affidavit did not establish probable cause for a search of Jadlowe's dwelling. A computer was also seized pursuant to a separate search warrant directed to Ferreira's residence at 80 Sagamore Street in New Bedford. The government does not oppose Ferreira's motion to suppress the seized computer and its contents.
[6] Dessesaure sets out a two-part test. Jadlowe fairly characterizes it: "[F]irst, the court must determine whether the application for the search warrant contains sufficient facts to support probable cause when the information learned during the unlawful entry is excised from the application and affidavit for the warrant. . . . Second, the court must determine whether the decision to seek the warrant was `prompted' by what was observed during the illegal entry." Jadlowe Post-Hearing Memorandum, at 10-11. See Dessesaure, 429 F.3d at 367. Jadlowe does not contest the first part of the test, conceding that even after excusing the sentence referring to the observation of the packages, ample probable cause remains to justify the issuance of the warrant for the garage. See United States v. Ford, 22 F.3d 374, 379 & n. 4 (1st Cir.1994); United States v. Veillette, 778 F.2d 899, 903-904 (1st Cir.1985).
[7] The plan was to provoke Gonsalves and Ferreira into coming to the garage in order to arrest them as they attempted to move the cocaine to a more secure location.
[8] The distinction between independent source and inevitable discovery is a fine one as the two doctrines essentially represent different ways of looking at the same result. "The significant difference between the tests is that under the independent source rule the inquiry is whether the government did in fact acquire certain evidence through an untainted source, while under the inevitable discovery rule the inquiry is whether evidence found because of a constitutional violation would inevitably have been discovered lawfully." Commonwealth v. Benoit, 382 Mass, 210, 217, 415 N.E.2d 818 (1981).
[9] While the agents could have obtained an anticipatory warrant, they were not required to do so. LaFave, supra, § 6.5(b), at 404, citing State v. Allen, 12 Or.App. 633, 508 P.2d 472 (1973), among other cases. I also credit the testimony of detective Simmons that DEA policy required task force agents to effectuate a seizure by any reasonable means given the quantity of cocaine involved.