Hillsborough-northern judicial district
No. 2008-009

### THE STATE OF NEW HAMPSHIRE

v.

### SCOTT ROBINSON

Argued: May 6, 2009
Opinion Issued: June 12, 2009

*Kelly A. Ayotte*, attorney general (*Nicholas Cort*, assistant attorney general, on the brief and orally), for the State.

*Theodore Lothstein*, assistant appellate defender, of Concord, on the brief, and *Paul Borchardt*, assistant appellate defender, of Concord, orally, for the defendant.

DUGGAN, J. Following a jury trial in the Superior Court (*Barry*, J.), the defendant, Scott Robinson, was convicted of robbery and first degree assault. *See* RSA 636:1 (2007); RSA 631:1 (2007). He appeals his convictions, arguing that the trial court erred in denying his motion to suppress. We reverse and remand.

The record supports the following facts. On March 18, 2006, around 9:50 p.m., Manchester police responded to a reported robbery at the Cross Town Variety Store. Upon arriving, witnesses told police that a white male, twenty-five to thirty years old, roughly six feet tall and weighing 200 pounds, wearing a Patriots jacket and a green hooded sweatshirt, entered the store, went behind the counter, and stabbed the clerk at least three times before leaving with cash from the register. A witness told police that he had followed the suspect as he left the store, and watched him run past a car and into an alley off Amory Street.

Upon searching the area behind the counter, police found a key ring, containing three keys, one of which belonged to a Kia automobile. After the employees denied that it belonged to any of them, the police presumed that it belonged to the suspect. Responding officers were then told to be on the lookout for a Kia in the area. Officers found a Kia nearby, and confirmed that the fleeing suspect had run past that car before turning into the alley. After relaying the license plate to dispatch, police learned that the car belonged to the defendant, that he lived eight blocks from the store in the direction the suspect had run, and that he had a prior robbery conviction. At that point, officers were sent to the defendant's apartment building.

While those officers were en route, another officer took the car key from the crime scene, inserted it into the door of the Kia and turned it; they matched. The officer relayed that information to the officers at the defendant's apartment building. By approximately 10:30 p.m., four officers were present outside the defendant's building. Officers outside the building could see movement inside, and those in the hallway outside the defendant's apartment could hear movement in the apartment. Officers also observed what appeared to be wet footprints in the hallway leading to the defendant's apartment door.

The officers knocked on the defendant's door and announced their presence but received no response. They then spoke to a neighbor and asked her if the defendant lived in that apartment. After officers brought

her down to a police cruiser and showed her a picture of the defendant on a computer, she confirmed that he lived there. Upon returning to the defendant's door, police heard a female voice say something to the effect of "you're such an idiot," and again knocked and announced their presence.

When the officers heard footsteps approaching the door, they unholstered their weapons and pointed them at the ground. The defendant's girlfriend, Kimberly Dunn, opened the door, at which point the officers raised their weapons, told her to get on her knees and searched her for a weapon. The trial court found that two officers simultaneously stepped into the apartment and opened a closed closet to ensure nobody was hiding there. Upon opening the closet, the officers saw a Patriots jacket and a green hooded sweatshirt.

Dunn then told the officers that the defendant was in the bedroom with a knife to his chest. The officers went to the bedroom, found the defendant, arrested him and took him out of the apartment. After conducting only a brief search for possible threats, the officers secured the premises and applied for a search warrant. At no time prior to entering the defendant's home did the officers attempt to secure a search or arrest warrant. Upon execution of the warrant, police seized a green sweatshirt, a Patriots jacket and a knife.

Before trial, the defendant moved to suppress the evidence found in his apartment, arguing that the officers' initial warrantless entry was unconstitutional. Following a suppression hearing, the trial court denied his motion in a written order. After a jury convicted the defendant of robbery and first degree assault, he filed this appeal.

On appeal, the defendant argues that the trial court erred in denying his motion to suppress. Specifically, he argues that: (1) the officer's insertion of the key into the car door was a warrantless search and violated his constitutional rights; (2) the police lacked probable cause to enter his home; and (3) no exigent circumstances existed to justify the warrantless entry into his apartment.

When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's findings unless they are unsupported by the record or clearly erroneous. *State v. Pseudae*, 154 N.H. 196, 199 (2006). We review the trial court's legal conclusions *de novo. Id.*

We first address the defendant's argument that the officer's insertion of the key into the Kia door was an unconstitutional search under both the Federal and State Constitutions. The trial court found that the police did not rely upon the key match in forming probable cause, and thus made no ruling on the issue. In the interests of judicial economy, however, we address the issue as it is likely to arise on remand and because there are sufficient facts in the record upon which we can reach our conclusion as a

matter of law. *Cf. Auger v. Town of Strafford*, 156 N.H. 64, 67 (2007). We initially address the defendant's claim under the New Hampshire Constitution, citing federal opinions for guidance only. *See State v. Ball*, 124 N.H. 226, 232-33 (1983).

■ Part I, Article 19 provides that "[e]very subject hath a right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and all his possessions." "We have . . . recognized that an expectation of privacy plays a role in the protection afforded under Part I, Article 19 of the New Hampshire Constitution." *State v. Goss*, 150 N.H. 46, 48 (2003). Thus, without an invasion of the defendant's reasonable expectation of privacy, there has been no violation of the defendant's rights under Part I, Article 19. *Compare Goss*, 150 N.H. at 48-49 (holding defendant has reasonable expectation of privacy in contents of black garbage bags left out for collection), *with State v. Johnston*, 150 N.H. 448, 452 (2004) (holding defendant had no reasonable expectation of privacy in curtilage to his home when there was no gate, he had not posted "no trespassing" signs and the driveway was visible from the street).

The State argues that Part I, Article 19 does not apply in this case because the insertion of the key into the door does not constitute a search for constitutional purposes. Indeed, the defendant acknowledges that federal courts have minimized the zone of protection with regard to inserting a key into a door. He argues, however, that we should adopt a standard of greater protection under the State Constitution. Although we have recognized that our constitution does, in some circumstances, provide greater protection than the Federal Constitution, *see, e.g., State v. Beauchesne*, 151 N.H. 803, 812 (2005), this is not such a case.

■■ Here, the privacy interest at stake is "so small that the officers do not need probable cause to inspect it." *United States v. Concepcion*, 942 F.2d 1170, 1173 (7th Cir. 1991); *accord United States v. Lyons*, 898 F.2d 210, 212-13 (1st Cir. 1990), *cert. denied*, 498 U.S. 920 (1990); *United States v. DeBardeleben*, 740 F.2d 440, 443-45 (6th Cir. 1984), *cert. denied*, 469 U.S. 1028 (1984); *Com. v. Alvarez*, 661 N.E.2d 1293, 1303 (Mass. 1996). Because vehicles must be registered and display license plates, *see* RSA 261:40 (Supp. 2008); RSA 261:75, II (2004), who owns a car is not private information. *See United States v. Grandstaff*, 813 F.2d 1353, 1358 n.6 (9th Cir. 1987), *cert. denied*, 484 U.S. 837 (1987). Rather, the private information protected by Part I, Article 19 is what lies behind the door. In this case, the officer removed the key from the convenience store with the permission of the store owner, inserted the key into the lock and turned the key. He did not open the door or conduct any search of the vehicle. Because the officer

did not intrude upon the defendant's reasonable expectation of privacy, the defendant's rights under Part I, Article 19 were not violated.

The defendant also argues that our ruling in this case is dictated by our prior rejection of an "identification search" exception to the warrant requirement. *State v. Webber*, 141 N.H. 817, 821 (1997). The case is inapplicable here. In *Webber*, a police officer reached into the defendant's wallet to remove a prescription card without the defendant's permission. *Id.* at 818. Our rejection of the exception was based upon the fact that the officer unreasonably searched the defendant's wallet, not upon the nature of what the officer sought. *Id.* at 821. Thus, *Webber* is inapposite to this case.

■ We reach the same result under the Federal Constitution. Whether the defendant's Fourth Amendment rights were violated turns upon whether he had a reasonable expectation of privacy in the thing searched. As federal courts have consistently held, the mere information of ownership obtained from inserting a key into a door is not the type of information in which a defendant has a reasonable expectation of privacy. *Concepcion*, 942 F.2d at 1173; *Lyons*, 898 F.2d at 212-13; *Grandstaff*, 813 F.2d at 1358 n.6; *DeBardeleben*, 740 F.2d at 443-45. Because the defendant had no expectation of privacy in this case, the officer's conduct did not violate the protections of the Fourth Amendment.

As to the defendant's second argument, we will assume, without deciding, that the police had probable cause to enter his apartment. The issue before us, therefore, is whether exigent circumstances justified the warrantless entry into his home. We first address the defendant's claim under the New Hampshire Constitution, citing federal opinions for guidance only. *See Ball*, 124 N.H. at 232-33.

■■ Under Part I, Article 19, a warrantless search or seizure is *per se* unreasonable, and evidence derived from such a search or seizure is inadmissible unless it falls within one of the recognized exceptions to the warrant requirement. *State v. Santana*, 133 N.H. 798, 803 (1991); *State v. Beede*, 119 N.H. 620, 625 (1979), *cert. denied*, 446 U.S. 993 (1980). The search of a home is subject to a particularly stringent warrant requirement because the occupant has a high expectation of privacy. *State v. Theodosopoulos*, 119 N.H. 573, 580 (1979), *cert. denied*, 445 U.S. 967 (1980). As the United States Supreme Court has recently made clear, exceptions to the warrant requirement must remain closely tethered to their underlying justifications lest they become incompatible with the fundamental principles secured by the Constitution. *See Arizona v. Gant*, 129 S. Ct. 1710, 1719 (2009). The State has the burden of proving by a preponderance of the evidence that the warrantless entry fell within one of the narrow, judicially-crafted exceptions. *State v. Rodriguez*, 157 N.H. 100, 103 (2008).

One such exception, which the State argues applies here, exists where police have probable cause to enter a home and exigent circumstances make it impracticable to obtain a warrant beforehand. *State v. Graca*, 142 N.H. 670, 673 (1998). Exigent circumstances exist where police face a compelling need for immediate official action and a risk that the delay inherent in obtaining a warrant will present a substantial threat of imminent danger to life or public safety or create a likelihood that evidence will be destroyed. *Rodriguez*, 157 N.H. at 104; *State v. MacElman*, 149 N.H. 795, 798 (2003). Whether exigent circumstances exist is judged by the totality of the circumstances, and is largely a question of fact for the trial court. *Rodriguez*, 157 N.H. at 104. Our totality review includes an examination of the overall reasonableness of the officers' conduct prior to entry, but no single factor controls. *Santana*, 133 N.H. at 804. We will not disturb the trial court's finding of exigent circumstances unless is it clearly erroneous. *Id.*

Here, the trial court determined that exigency existed because the officers, upon arriving at the defendant's home, "were essentially in hot pursuit, without time to reflect upon the situation or obtain a warrant." The trial court directed the majority of its analysis to the officers' actions after the defendant's girlfriend opened the door. Even the State acknowledges, however, that this case is not one of hot pursuit, which "requires immediate and continuous pursuit of a defendant from the scene of a crime." *State v. Ricci*, 144 N.H. 241, 244 (1999). In *Ricci*, for example, police followed an intoxicated driver to his house, and then ran inside after him when the driver tried to hide in his home. *Id.* at 242. Here, police arrived at the defendant's home approximately forty to forty-five minutes after the robbery was reported; such a delay cannot be considered hot pursuit.

The defendant concedes that exigent circumstances existed once Dunn told the officers that the defendant had a knife to his chest. He argues, however, that the police themselves created the exigent circumstances, which did not exist before they entered his home.

As the defendant points out, "The primary focus of our inquiry . . . is not on the *sufficiency* of the exigency but rather how the exigency came about." *Santana*, 133 N.H. at 805. Thus, if no exigency existed before the police became involved, the police cannot themselves create the exigency to justify a warrantless entry. *Rodriguez*, 157 N.H. at 108; *Santana*, 133 N.H. at 807; *Theodosopoulos*, 119 N.H. at 581. In our analysis of whether police presence was the cause of the exigency, two considerations act as "guideposts": (1) the presence or absence of "ample opportunity" to get a warrant; and (2) the degree to which the exigency relied upon by the State was foreseeable. *See Rodriguez*, 157 N.H. at 108 (quotation omitted).

In *Rodriguez*, for example, police officers detected the odor of burning marijuana outside a hotel room while investigating an unrelated crime. *Id.* Because the officers had not gone to the hotel to investigate the drug crime, we found that the exigency was not foreseeable. *Id.* at 109. Thus, in light of the ongoing destruction of evidence in the hotel room, there was no opportunity to secure a warrant before knocking and entering. *Id.* at 110. We therefore held that the trial court's finding of exigent circumstances was not clearly erroneous. *Id.* at 110; *see Santana*, 133 N.H. at 807 (police may not rely upon an "expected exigency" to justify warrantless entry into defendant's apartment where "police, with ample probable cause, time to obtain a warrant, and time for reflection, choose to pursue a course of action which they know at the outset [would] present a situation requiring an emergency entrance into a person's home"); *Mendez v. People*, 986 P.2d 275, 282 (Colo. 1999) (affirming finding of exigency because police encounter was inadvertent and no officer "made a deliberate decision to go to the motel" to gather evidence of that particular crime), *cert. denied*, 529 U.S. 1070 (2000).

Here, police made the deliberate determination to go to the defendant's home to investigate the robbery. The State argues that the defendant posed a danger to others based upon the robbery, and that the police therefore faced exigent circumstances requiring immediate action. As discussed below, however, the State cannot point to any evidence that would have led the police to reasonably conclude that the defendant continued to pose a threat once he retreated to his apartment. It was not until after police entered his home that they knew of the specific exigency of the defendant holding a knife to his chest. Two officers testified that they secured Dunn and simultaneously searched a nearby closet for a concealed individual, at which time Dunn informed them that the defendant was in the bedroom with a knife to his chest. By that point, however, the officers had already entered his home without consent, and without first obtaining a warrant. Because the police had no knowledge of any exigency until after they entered the home, the State cannot now rely upon the ensuing emergency to justify the initial entry. *See Rodriguez*, 157 N.H. at 108; *Santana*, 133 N.H. at 807.

The State argues, however, that exigency existed prior to the officers' entry into the apartment and Dunn's statement. Specifically, the State argues that the facts of this case support a "fleeing suspect" exigency. In support, the State cites *Dorman v. United States*, 435 F.2d 385 (D.C. Cir. 1970). There, the United States Court of Appeals for the District of Columbia Circuit set forth six factors that may be useful for determining exigency: (1) a grave offense occurred, particularly one involving violence;

(2) the suspect is reasonably believed to be armed; (3) there exists not merely the minimum of probable cause, but beyond that a clear showing of probable cause; (4) there is strong reason to believe that the suspect is in the premises being entered; (5) there is a likelihood that the suspect will escape if not swiftly apprehended; and (6) the circumstance that the entry, though not consented, is made peaceably. *Dorman*, 435 F.2d at 392-93. *Dorman* also considered the time of entry and the *actual* difficulty police faced in obtaining a warrant. *Id.* at 394-95.

Although federal courts have diverged in their acceptance and application of the *Dorman* test, the United States Supreme Court remained largely silent on the matter until *Minnesota v. Olson*, 495 U.S. 91 (1990). In *Olson*, a lone gunman robbed a gas station shortly before 6:00 a.m., fatally shooting the manager. *Olson*, 495 U.S. at 93. Police drove to the house of a suspect, and met another car, driven by the defendant, in which the suspected gunman was a passenger. *Id.* The two men fled from the car and the gunman was captured, but the defendant managed to escape. *Id.* Inside the car, police found materials identifying the defendant. *Id.* The next morning, a woman called the police and said that the defendant had driven the car in the robbery and that he planned to leave town by bus. *Id.* She also gave an address for two women who knew where to find the defendant. *Id.* Later that afternoon, police surrounded the home. *Id.* at 94. After they determined that the defendant was inside, they entered the house without permission or a warrant and with weapons drawn. *Id.* The Minnesota Supreme Court applied the *Dorman* analysis and determined that no exigency existed. *State v. Olson*, 436 N.W.2d 92, 97 & n.1 (Minn. 1989).

On appeal, the United States Supreme Court did not expressly adopt or reject *Dorman*, but held that the Minnesota Supreme Court "applied essentially the correct standard in determining whether exigent circumstances existed." *Olson*, 495 U.S. at 100. The Court noted that the state supreme court observed that "a warrantless intrusion may be justified by hot pursuit of a fleeing felon, or imminent destruction of evidence, or the need to prevent a suspect's escape, or the risk of danger to the police or to other persons inside or outside the dwelling." *Id.* (quotation omitted). The Court also noted that the state court considered "the gravity of the crime and the likelihood that the suspect is armed." *Id.* The Court stated that it was "not inclined to disagree with this fact-specific application of the proper legal standard," and affirmed the state court's finding that no exigency occurred. *Id.*

██ We see no need to adopt *Dorman* in light of the Supreme Court's decision in *Olson*. We, like the Court, have consistently held that the determination of exigency rests upon the totality of the circumstances. *See*

*Rodriguez*, 157 N.H. at 104; *Santana*, 133 N.H. at 804. Police, as well as courts reviewing a warrantless entry, should consider the danger of imminent destruction of evidence, the gravity of the offense, the likelihood the suspect is armed, the need to prevent a suspect's escape, and the risk of danger to the police or to other persons inside or outside the dwelling. *See Olson*, 495 U.S. at 100; *Welsh v. Wisconsin*, 466 U.S. 740, 753 (1984). In this case, although the gravity of the offense was serious and the defendant was believed to be armed, our examination of the totality of the circumstances forces us to conclude that no exigency existed that made it impractical to secure a warrant beforehand.

The State cannot point to any substantive evidence that would have led officers to believe that the defendant would either destroy evidence or attempt to flee his home, or that he posed a risk if not immediately apprehended. *Compare State v. Morse*, 125 N.H. 403, 409 (1984) (holding no exigency when "officers had no apparent grounds for a belief that the defendant would escape"), *with United States v. Williams*, 612 F.2d 735, 737 (3d Cir. 1979) (finding exigency where defendant was armed and reliable informant told police he planned to "get his affairs together and then head south"), *cert. denied*, 445 U.S. 934 (1980). Indeed, an officer at the suppression hearing testified that they had no reason to believe evidence was being destroyed or would be if they did not act quickly, and no officer articulated a fear that the defendant would escape. *See Welsh*, 466 U.S. at 751 ("When an officer undertakes to act as his own magistrate, he ought to be in a position to justify it by pointing to some real immediate and serious consequences if he postponed action to get a warrant." (quotation omitted)).

The situation here is similar to that in *Olson*, where there was no risk of immediate flight, no suggestion of danger to officers, and "[t]hree or four Minneapolis police squads surrounded the house." *Olson*, 495 U.S. at 101 (quotation omitted). Had Olson come out, "he would have been promptly apprehended." *Id.* (quotation omitted). Here, police had no specific information that the defendant intended to flee, and, indeed, had his apartment surrounded so as to prevent flight. Furthermore, before officers knocked on his door, there was no evidence that the defendant was an immediate danger to himself, to the police or to the other person in the apartment. Although the State argues that he was at least a danger to Dunn based upon his conduct at the store, it cannot point to any other evidence to suggest that she was actually in danger. *See State v. Slade*, 116 N.H. 436, 438 (1976) (holding gunshots in home justified warrantless police entry to determine whether there was a victim); *see also United States v. Holloway*, 290 F.3d 1331, 1336-37 (11th Cir. 2002) (listing cases and situations in which endangerment to life justified warrantless entry), *cert. denied*, 537 U.S. 1161 (2003); *People v. McBride*, 872 N.Y.S. 2d 109 (N.Y. App. Div. 2009)

(finding exigent circumstances when police observed distraught and hyperventilating woman through window who was unable to respond to inquiries about what was happening). Indeed, the fact that the defendant had returned to his own home during the night hours militates against a finding of exigency. *See Hathcock v. Cohen*, 547 F. Supp. 2d 1271, 1277 n.7 (S.D. Fla. 2008) (noting that burglary suspect fleeing into "another's home gives rise to exigent circumstances whereas a suspect entering his own home does not").

The State argues that the facts here are analogous to *Theodosopoulos*, in which we held that exigent circumstances existed. *Theodosopoulos*, 119 N.H. 573. There, a sniper fired a shot into a police station, seriously injuring an officer and a civilian. *Id.* at 576. Police then methodically searched neighboring buildings until forcing their way into the defendant's apartment. *Id.* at 577. They found him apparently asleep in the bedroom, with a riflescope and spent shell casings on a table and marijuana plants on the floor. *Id.* at 578. We held that the nature of the "highly volatile" emergency and the need to protect the public from further harm justified the warrantless search of the area and the defendant's apartment. *Id.* at 580-81. The State argues that this case is similar in that both cases involved only one incident of violence and a continuous, methodical search for the suspect. Here, however, police had no reason to believe that the defendant posed any danger in his current location, whereas in *Theodosopoulos*, police were unsure of the sniper's location and reasonably feared he might fire again if not apprehended.

Finally, we consider the fact that the officers did not even attempt to obtain a warrant after learning the location of the defendant's home. In *Dorman*, for example, police were unable to obtain a warrant because the magistrates who were supposed to be available that night were not. *Dorman*, 435 F.2d at 394-95; *see United States v. Campbell*, 581 F.2d 22, 27 (2d Cir. 1978) (considering fact that although no warrant application was filed, officers did contact an Assistant United States Attorney for an evaluation of their situation, and thus "showed their respect for the Fourth Amendment"). *But see State v. Steimel*, 155 N.H. 141, 149 (2007) (holding officer does not necessarily need to attempt to find a magistrate when time lost would risk destruction of evidence). In contrast, the Supreme Court held in *Olson* that once police had the home surrounded and foreclosed the defendant's escape, they were required to obtain a warrant. *Olson*, 495 U.S. at 101. Here, police had surrounded the defendant's apartment and effectively foreclosed the possibility of flight.

■ Because the record does not reveal any evidence that would have led the police to reasonably believe that the defendant continued to pose a

danger to himself, to the police or to the other occupant in the apartment, because the police had blocked any routes of escape, and because the officers testified that they had no reason to believe evidence was being or would be destroyed, we hold that no exigent circumstances existed requiring immediate, warrantless entry. The trial court's denial of the defendant's motion to suppress was therefore clearly erroneous.

In light of our ruling under the State Constitution, we need not reach the federal issue. *See Ball*, 124 N.H. at 237.

*Reversed and remanded.*

BRODERICK, C.J., and DALIANIS and HICKS, JJ., concurred.