NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by E-mail at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: http://www.courts.state.nh.us/supreme.

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Strafford
No. 2015-0174


THE STATE OF NEW HAMPSHIRE

v.

CHRISTOPHER GAY

Argued: February 17, 2016
Opinion Issued: July 27, 2016


Joseph A. Foster, attorney general (Sean P. Gill, attorney, on the brief and orally), for the State.


Law Offices of Kelly E. Dowd, PLLC, of Keene (Kelly E. Dowd, on the brief and orally), for the defendant.


CONBOY, J. The defendant, Christopher Gay, appeals his convictions, following a jury trial, for second degree murder and conspiracy to commit robbery. See RSA 630:1-b, I(b) (2007); RSA 629:3 (2007); RSA 636:1 (2007). He argues that the Superior Court (Brown, J.) erred in denying his motion to suppress evidence obtained from an allegedly unconstitutional search and seizure. He further argues that the Trial Court (Tucker, J.) erred in excluding evidence of an "alternative perpetrator" and in allowing the State's expert witness to testify regarding certain footwear impressions. We affirm.

The defendant's convictions arose out of the January 21, 2012 robbery and stabbing of Ryan Stewart in Farmington. The defendant was charged with two alternative counts of first degree murder and one count of second degree murder. He was also charged with one count of conspiracy to commit robbery, which alleged that, "with the purpose that the crime of robbery be committed, [he] agreed with Cory Bennett, to commit or cause the commission of such crime" and that he committed one or more of certain enumerated overt acts in furtherance of the conspiracy.

Prior to trial, the court made a number of rulings unfavorable to the defendant. First, it denied his motion to suppress evidence obtained as a result of a police officer's entry onto his property with a trained police dog and his subsequent detention by two police officers in the driveway of his residence. Next, the trial court granted the State's motion to exclude evidence proffered by the defendant that a third person was guilty of the crimes. Finally, it allowed a State's expert witness to testify that certain footwear impressions found at the crime scene could have been made by a particular type of footwear. The defendant appeals these rulings. We address each of the defendant's arguments in turn.

I.     Suppression Motion

The following facts are taken from the trial court's order denying the defendant's motion to suppress or are otherwise found in the record. Shortly before midnight on January 21, 2012, Sergeant Ferguson and Officer Wheeler of the Farmington Police Department were driving to the police department when Ferguson observed a man walking on Worster Street, which runs along the rear side of the police department. The man entered an apartment building located at 11 Worster Street.

At 12:02 a.m. on January 22, a few minutes after Ferguson and Wheeler had returned to the police department, the Farmington Fire Department and Ambulance medical tone sounded. The ensuing call reported that there was a stabbing victim at 11 Worster Street. Ferguson, Wheeler, and another Farmington police officer ran out of the building to render assistance. Upon exiting the police department, Ferguson saw a man lying on the ground near the bottom step of the apartment building and a woman coming out of the building. Ferguson recognized the man as Stewart and the woman as Amanda DeGroat, both of whom he knew to be residents of separate apartments in the building. Stewart had puncture wounds to his torso and was bleeding. DeGroat was on her cellular telephone with a 911 operator.

The other officers on the scene began to render assistance to Stewart and secured the egresses from the apartment building. Ferguson directed an officer from a neighboring town, who had arrived on the scene, to patrol the area and provided him with a description of the man he had earlier witnessed enter the

apartment building. Ferguson instructed Wheeler and another officer to secure Stewart's apartment. Wheeler testified at the suppression hearing that Stewart's apartment had "blood everywhere" and that there were signs of a struggle in the living room. He also noticed that a safe across from the bed in the bedroom was ajar and had a bloody handprint on it.

Ferguson then reviewed surveillance videos from cameras positioned on the outside of the police department. One of the cameras, positioned at the corner of the police department facing the apartment building, captured an image of the individual Ferguson had witnessed enter the apartment building. The video showed that, approximately fifteen seconds later, another individual entered the apartment building and, approximately seven minutes after that, two individuals simultaneously left the building and ran north on Worster Street. After viewing the surveillance videos, Ferguson went with another officer to the northern side of 11 Worster Street where he observed several footprints in the snow pointing north, some of which contained blood. Ferguson placed cardboard boxes over some of the footprints and pulled several officers back so as not to taint the crime scene. He then posted officers at various street intersections near the scene.

At 12:29 a.m., Ferguson requested that Officer Mackenzie of the Rochester Police Department respond to the scene with his police dog to conduct a canine track. While waiting for the canine unit, Ferguson learned from Wheeler that Stewart had been pronounced dead. Wheeler also informed Ferguson that DeGroat told him that she had heard what sounded like an argument in Stewart's apartment and she identified one of the individuals' voices as Stewart's. Although she could not identify the other individual's voice, she described the individual as speaking with "African-American . . . slang-type verbiage." DeGroat also said that shortly after hearing the argument, she heard two sets of footsteps running down the stairs. Stewart then knocked on DeGroat's door and asked her for help. At that point, DeGroat telephoned 911.

Based upon the appearance of the man he witnessed enter the apartment building and DeGroat's description of the unknown individual's manner of speaking, Ferguson suspected the defendant. Although the defendant is Caucasian, Ferguson testified that prior interactions with the defendant led him to believe that the defendant's manner of speaking was consistent with DeGroat's description. Ferguson testified that he knew the defendant lived on Bunker Street, about a five-minute walk from the police department.

When Mackenzie arrived with his dog, a female bloodhound named Daisy Mae, Ferguson told him that he had a suspect, but did not tell him that it was the defendant. Ferguson directed Mackenzie to start the canine track about 10 to 15 yards away from the apartment building on Worster Street in an area of

3

snow that appeared to be disturbed and contained footprints. Mackenzie testified that Daisy Mae is what is referred to as a "trailing dog," meaning that she trails the scent from "skin rafts." He explained that skin rafts are "dead skin cells" that are discarded by people and, depending upon the surrounding conditions, settle to the ground within 15 to 20 minutes. He stated that skin rafts tend to collect in "hard places" like driveways or the base of houses. He explained that skin rafts can easily be dispersed by the wind.

At approximately 1:06 a.m., Ferguson informed dispatch that he and Mackenzie were conducting the canine track. Once Daisy Mae picked up the scent, she led MacKenzie to the driveway of a home nearby, where it appeared that a party was going on. After sniffing around the base of the home, Daisy Mae indicated that she wanted to continue back onto the street. She then led the officers to 29 Bunker Street. On the way, the officers found an empty 12 ounce Budweiser can with a red tab, which, because it had no snow, salt or debris on it, appeared to have recently been discarded.

Daisy Mae proceeded onto the property at 29 Bunker Street. She sniffed the base of the residence near the driveway and continued to the back of the house. She then attempted to climb onto the back porch, but Mackenzie stopped her. Mackenzie testified that, at this point, Daisy Mae went around to the back of the porch and became "frantic," indicating that she had lost the scent. Mackenzie allowed Daisy Mae to explore the area to try to pick up the scent again, but when she was unsuccessful, he informed Ferguson that Daisy Mae had lost the scent. At this point, Ferguson told Mackenzie that this location was where the defendant, whom he originally suspected, resided. Ferguson and Mackenzie then left the property, and, at 1:15 a.m., Ferguson informed dispatch that they were headed back to the police department.

Ferguson assigned Wheeler and another officer to conduct surveillance of the residence. Wheeler was posted on Bunker Street in front of the residence, while the other officer was posted in a driveway facing the back door of the residence. Soon after Wheeler arrived at the residence, he observed a man leave by way of the back door and go into the backyard. Wheeler illuminated the individual with his flashlight and attempted to make contact with him, but the individual ignored Wheeler's attempts and went back into the residence.

Ferguson decided to attempt contact with the defendant to see if he had any information about Stewart's death. Arriving at approximately 1:33 a.m., he parked his cruiser near the residence. Ferguson could see what he estimated to be four to six people moving around inside the residence and looking out the windows. Ferguson and Wheeler spoke for a moment, and then the defendant came out of the back door of the residence and told the officers that, if they wanted to talk with him, they should "come up [to the residence] like men." (Quotation omitted.) Ferguson tried to engage the defendant in conversation, but the defendant called Ferguson a derogatory name and went inside.

4

Shortly thereafter, the defendant returned to the back porch and engaged the officers again.  Wheeler stated that he attempted to be friendly to the defendant.  At this point, Wheeler and Ferguson were taking cover behind one of the police cruisers.  Wheeler testified that he did not have his gun drawn, but that he believed Ferguson had his gun drawn, down by his leg.  Ferguson testified that, although he was not positive whether he had his gun drawn, if he had, he would have written a report in accordance with police department policy.  No such report was introduced at the hearing.

After a short exchange, the defendant agreed to meet the officers in the driveway.  Wheeler testified that he did not have his gun drawn, but that he could not recall whether Ferguson did.  Ferguson stated that if he had drawn his gun, he would have holstered it prior to meeting the defendant.  Ferguson used his flashlight to illuminate his path while walking.  As they approached, the officers, who knew the defendant had been previously arrested on a weapons charge, asked the defendant to lift up his sweatshirt and turn around to show them that he did not have any weapons in his waistband.  The officers noticed that the defendant was holding a Budweiser can with a red tab, similar to the one found during the canine track.  Ferguson also saw what appeared to be a fresh abrasion on the knuckle of the defendant's right index finger.

The defendant told the officers that he was home all night.  He told the officers that people had been coming and going and that they were "just hanging out."  Ferguson stated that the defendant appeared intoxicated, but did not appear nervous.  Wheeler testified that the defendant "seemed to be on some sort of high.  He was very animated.  He was very in your face which was not typical from [Wheeler's] past dealings with [the defendant]."  The defendant told the officers that the only people in the house at that time were his mother, who was sick, and his girlfriend, who was sleeping.  Ferguson found this suspicious because he had earlier observed more than three people in the residence.

Ferguson asked the defendant if the officers could speak with his mother and his girlfriend.  Ferguson testified that the defendant seemed reluctant, but went into the residence through the back door, leaving the officers on the back porch.  Shortly thereafter, the defendant's girlfriend appeared in the doorway.  She told the officers that she believed the defendant had been home all night, but that she had been "up and down the stairs."  While the officers were speaking with the defendant's girlfriend, the defendant began playing music, asking the officers what music they liked.  The defendant then gave a "fist-bump" to the officers, and the officers left the residence at approximately 2:00 a.m.  Ferguson asked Wheeler to continue surveillance on the residence.  Wheeler remained at the residence until approximately 4:00 a.m., but made no further contact with the defendant.

Ferguson returned to the police department and drafted an application for a warrant to search the defendant's residence, which he later amended to include its curtilage, as well as a warrant to search the defendant's person. The warrants were subsequently issued and executed. Later that same day, the defendant was arrested based upon evidence found as a result of the execution of the search warrants.

Prior to trial, the defendant moved to suppress all evidence obtained as a result of Mackenzie's entry onto his property with Daisy Mae and the officers' detention of him in his driveway. He maintained that Daisy Mae's track leading to his residence constituted an unlawful warrantless search. He further argued that he was unlawfully seized when Ferguson and Wheeler approached him outside his residence.

Following a hearing, the trial court denied the motion. The trial court concluded that, even assuming Mackenzie's entry onto the defendant's property with Daisy Mae constituted a search, exigent circumstances justified the search. Specifically, the court determined that there was probable cause to believe that the scent trail tracked by Daisy Mae led to the defendant's property. The court further reasoned that, if the police were "required to get a warrant in order [to] enter someone's property, it would likely be futile for police to utilize canine trails as the natural dispersion of the skin rafts outpaces the police's ability to write and obtain a warrant." Because the police "were aware that this was a homicide investigation," and there were bloody footprints found outside the apartment building, the court determined that "[t]he dog trail . . . was the police's best mechanism to ensure a homicide suspect did not escape." Thus, the court concluded that an exigency existed for "the limited police intrusion of allowing [Daisy Mae] to sniff the outside of the [defendant's] property." With regard to the defendant's claim that the officers unlawfully seized him in his driveway, the court found that, "[a]ssuming a seizure occurred[,] . . . sufficient reasonable suspicion existed for an investigatory stop."

On appeal, the defendant argues that the trial court erred in denying his motion to suppress because the warrantless search of his property and his subsequent detention in his driveway violated his state and federal constitutional rights to be free from unreasonable searches and seizures. See N.H. CONST. pt. I, art. 19; U.S. CONST. amend. IV. We first address the defendant's claims under the State Constitution and cite federal opinions for guidance only. State v. Ball, 124 N.H. 226, 231-33 (1983).

When reviewing a trial court's ruling on a motion to suppress, we accept the trial court's factual findings unless they lack support in the record or are clearly erroneous. State v. Rodriguez, 157 N.H. 100, 103 (2008). Our review of the trial court's legal conclusions, however, is de novo. Id.

We begin by addressing the defendant's argument that Mackenzie's entry onto his property with Daisy Mae constituted an unlawful warrantless search. The trial court determined that, even assuming a search occurred, the search was justified under the exigent circumstances exception to the warrant requirement. Under Part I, Article 19 of our State Constitution, warrantless entries are per se unreasonable and illegal unless they fall within the narrow confines of a judicially crafted exception to the warrant requirement. Id. The State bears the burden of proving by a preponderance of the evidence that such an entry falls within one of these exceptions. Id. At issue here is the "exigent circumstances" exception, which has two elements: probable cause and exigent circumstances. See id. The defendant does not challenge the trial court's finding that there was probable cause to believe that the scent trail led to his property. We, therefore, need not address that element and turn our attention to whether exigent circumstances existed.

"Exigent circumstances exist where the police face a compelling need for immediate official action and a risk that the delay caused by obtaining a search warrant would create a substantial threat of imminent danger to life or public safety or likelihood that evidence will be destroyed." Id. at 103-04 (quotations and citation omitted). Whether a situation is sufficiently urgent to permit a warrantless search depends upon the totality of the circumstances, State v. Theodosopoulos, 119 N.H. 573, 580 (1979), and is largely a question of fact for the trial court, which we will not disturb unless clearly erroneous, State v. MacDonald, 129 N.H. 13, 21 (1986).

Our totality review includes an examination of the overall reasonableness of the officers' conduct prior to entry, and no single factor controls. State v. Robinson, 158 N.H. 792, 798 (2009). Police, as well as courts reviewing a warrantless entry, should consider the danger of imminent destruction of evidence, the gravity of the offense, the likelihood the suspect is armed, the need to prevent a suspect's escape, and the risk of danger to the police or to other persons inside or outside the dwelling. Id. at 801. When reviewing the totality of the circumstances, we consider the degree to which the exigency relied upon by the State was foreseeable. State v. Santana, 133 N.H. 798, 806 (1991). We stress, however, that the extent to which "exigency was foreseeable at the time the decision was made to forego or postpone obtaining a warrant does not, by itself, control the legality of a subsequent warrantless search triggered by that exigency." Id. (quotation omitted).

Here, the record supports the trial court's finding that exigent circumstances existed justifying the entry onto the defendant's property. At the time Ferguson and Mackenzie conducted the canine track, they were aware that Stewart had died from his wounds and, thus, that they were investigating a homicide. Mackenzie testified that Daisy Mae was trailing the scent from skin rafts and that they tend to collect on "hard places" such as driveways or the base of houses. He stated that skin rafts can easily be dispersed by the

wind. As the trial court found, the skin rafts the officers were searching for were "at the mercy of the surrounding weather conditions and [were] susceptible of being dispersed by the wind." The possibility that the scent trail left by the suspect would disperse prior to the time that it would have taken the officers to obtain a warrant presented a situation requiring an emergency entrance onto the defendant's property. See Rodriguez, 157 N.H. at 107 (holding that odor of burning marijuana gave rise to exigent circumstances justifying warrantless entry by police into hotel room because delay in obtaining a search warrant created likelihood that evidence of marijuana possession would be destroyed by burning).

Moreover, the physical intrusion onto the defendant's property was minimal. See MacDonald, 129 N.H. at 21-22 (noting that "limited nature of the search lends credence to the position that the officer's search was reasonable"). When Daisy Mae attempted to climb onto the back porch, Mackenzie stopped her and, as soon as it became apparent that she had lost the scent, the officers left the property.

The defendant argues that, because Ferguson suspected the defendant was involved in the crimes prior to the use of Daisy Mae, he "could reasonably foresee that the search would end in the invasion of the curtilage of [the defendant's] residence." Assuming that Ferguson's initial suspicion of the defendant may have led him to foresee that the canine track would end at the defendant's residence, foreseeability does not, by itself, control the legality of the search. See Santana, 133 N.H. at 806. Rather, we examine the totality of the circumstances. See id. at 804. When we do so, we consider as one factor the degree to which the exigency itself was foreseeable. See id. at 806.

In Santana, for instance, we concluded that the police could not rely upon the exigent circumstances exception to justify their warrantless entry into the apartment where the defendant was arrested. Id. at 799-800, 807. In that case, the detective understood from the beginning that, under his planned drug buy, an emergency situation would likely arise requiring the police to enter the apartment. Id. at 806. Thus, the exigency was not just foreseeable but was the expected result of the detective's planned buy. Id. Further, the exigency was foreseeable at a point in time when the police could have obtained a search warrant. Id. at 807. One day before the entry, the detective prepared the search warrant application and completed all but the last three paragraphs of the affidavit. Id. However, instead of seeking the warrant at that time, the detective decided to wait until the drug buyer had been arrested and entry had been made into the apartment. Id.; see also id. at 802.

Here, the exigency was not the result of an expected emergency situation. Rather, the exigency arose as a result of the murder and the need to track the skin rafts prior to their dispersal. The officers did not have time to obtain a warrant prior to commencing the canine track because the delay

inherent in obtaining a warrant created a likelihood that the skin rafts would be dispersed. See Rodriguez, 157 N.H. at 107. Nothing in the record demonstrates that the officers' behavior prior to the canine track was unreasonable or that there was sufficient opportunity for them to have obtained a search warrant before conducting the canine track. Cf. Santana, 133 N.H. at 807 (concluding that police may not rely upon an "expected exigency to justify their [warrantless] entry" where police had "ample probable cause, time to obtain a warrant, and time for reflection," but chose to "pursue a course of action which they [knew] at the outset [would] present a situation requiring an emergency entrance").

The defendant further maintains that, at the time the officers arrived at his residence, they "could have elected, instead of invading the curtilage, to determine whether the dog could pick up the trail elsewhere by taking the dog about the perimeter of the property, without actually invading the curtilage." The constitutionality of a given search, however, "does not turn on this court's after-the-fact evaluation of whether, as a tactical matter, the police could have deployed their forces differently in response to a confusing emergency situation." Theodosopoulos, 119 N.H. at 582. Here, the officers methodically attempted to ascertain the whereabouts of a possible suspect in a murder investigation before the evidence leading them to the suspect dissipated. Under these circumstances, we agree with the trial court that the warrantless entry onto the defendant's property was justified by the exigencies of the situation.

Because our State Constitution provides at least as much protection as does the Federal Constitution under these circumstances, see Rodriguez, 157 N.H. at 110; Illinois v. McArthur, 531 U.S. 326, 330-31 (2001), we reach the same result under the Federal Constitution.

We next turn to the defendant's argument that the trial court erred in denying his motion to suppress evidence obtained from his detention in his driveway. The trial court assumed that a "seizure occurred" when the officers spoke with the defendant in his driveway, but nonetheless found "that sufficient reasonable suspicion existed for an investigatory stop." The defendant maintains that the trial court "erred in utilizing the 'reasonable suspicion' standard" rather than the probable cause standard. He argues, in essence, that his detention in his driveway was not a mere investigative stop, see Terry v. Ohio, 392 U.S. 1, 20-27 (1968), but that he was in custody — that is, the functional equivalent of arrest — requiring probable cause. He contends that, although "there may have been reasonable suspicion, there was not probable cause to take [him] into custody at that time."

We conclude, as a matter of law, that the defendant was not subject to the functional equivalent of arrest. Because the defendant relies solely upon

the State Constitution, we base our decision on it, using federal cases only to aid our analysis.  See State v. Grey, 148 N.H. 666, 668 (2002).

A suspect is considered "seized" if, in view of all the circumstances surrounding an investigatory stop, a reasonable person would have believed that he was not free to leave.  State v. Turmel, 150 N.H. 377, 383 (2003).  "Not every seizure rises to the level of an arrest."  State v. Wong, 138 N.H. 56, 62 (1993) (quotation and ellipsis omitted).  Although "[a] reasonable perception of loss of freedom to leave signals that a seizure has occurred," it does not necessarily signify that the seizure is an arrest.  Id. (quotation omitted).  "The determination of when an arrest occurs depends upon the facts and circumstances of a particular case."  Id. (quotation and brackets omitted).  While a warrantless arrest is unlawful if not supported by probable cause, id., "the police may temporarily detain a suspect for investigatory purposes, on grounds that do not amount to probable cause to arrest him for the commission of a crime," State v. Reid, 135 N.H. 376, 380 (1992) (quotation omitted).  For such a detention to be lawful under the State Constitution, the police must have "reasonable suspicion — based on specific, articulable facts taken together with rational inferences from those facts — that the particular person stopped has been, is, or is about to be, engaged in criminal activity."  State v. Dalton, 165 N.H. 263, 265 (2013) (quotation omitted).  The scope of the stop, however, must be carefully tailored to its underlying justification, must be temporary, and must last no longer than is necessary to effectuate the purpose of the stop.  See Turmel, 150 N.H. at 383; Wong, 138 N.H. at 63.

Here, taking the facts as found by the trial court, we conclude that, as a matter of law, the defendant's assumed seizure did not rise to the level of the functional equivalent of arrest.  The defendant agreed to meet the officers in his driveway.  At no time did the officers order the defendant to speak with them; indeed, the defendant initially came out of his residence on his own and then went back inside.  Further, only two officers spoke to the defendant.  Cf. Turmel, 150 N.H. at 384-85 (determining that defendant not in custody for purposes of Miranda where only two officers spoke to him and were in his immediate vicinity).  Although the officers asked the defendant to lift his shirt to demonstrate that he did not have any weapons, the defendant was not confined or physically restrained during the questioning.  See Wong, 138 N.H. at 63 (concluding that investigative stop did not rise to level of arrest where defendant was neither confined, nor restrained).  Although there was testimony that Ferguson may have had his gun out at some point, there is no evidence that he used his gun in a show of force and he stated that his gun would have been holstered when he and Wheeler met the defendant.

Moreover, during the conversation, the defendant held his beer can and, according to Ferguson, did not appear nervous.  The officers, who were investigating a murder that had occurred several hours earlier, spoke to the defendant about where he had been during the preceding hours and who was

10

in his residence.  Cf. Turmel, 150 N.H. at 384 (determining that defendant not in custody for purposes of Miranda when officers questioned defendant during motor vehicle stop about whether he had been smoking marijuana).  When the officers asked to speak to the defendant's girlfriend, the defendant went inside to get her and the officers waited on his porch.  While the officers spoke with his girlfriend, the defendant again went inside and began playing music, asking the officers what music they liked.  The officers left the residence and, as they did so, the defendant gave them a "fist-bump."  The entire "detention," including the time the officers spoke with the defendant's girlfriend, lasted approximately twenty minutes.

Because we conclude on these facts that any seizure had not escalated to the functional equivalent of an arrest, we hold that the trial court did not err in utilizing the reasonable suspicion standard rather than the probable cause standard.  We, therefore, need not address the defendant's further contention that the officers lacked probable cause to subject the defendant to the functional equivalent of arrest.

## II.    Alternative Perpetrator Evidence

The defendant argues that the trial court erred in excluding evidence that a third person was guilty of the crimes.  Prior to trial, the State moved to exclude evidence that Devon Smith, an African-American friend of co-defendant Bennett, had committed the crimes.  The State argued that, although Stewart's neighbor claimed she heard a dispute in Stewart's apartment around the time of the crimes and that one of the voices she heard sounded "African-American," there was no evidence connecting Smith to the crimes other than the facts that he is African-American and was a friend of co-defendant Bennett.  Thus, the State asserted that any evidence that Smith "allegedly has gang affiliations, owns weapons, has committed other crimes, or is generally a 'scary' person must be excluded" pursuant to New Hampshire Rule of Evidence 404(b) because the defendant could not demonstrate "that such 'bad acts' have any nexus to the crimes charged."

The defendant objected, asserting that there was evidence that Smith had a motive to commit the crimes.  He explained that a witness had previously testified "that the entire conflict which led to the death of [Stewart] centered around a dispute between [Bennett] and [Smith] on one side, and [Stewart] and two of his friends on the other."  The defendant maintained that deleted text messages between that witness and Smith demonstrated that Smith was involved in the crimes, and that an "'ear witness' place[d] an African[-]American at the scene."

The defendant also pointed to statements from individuals who claimed that Bennett had told them Smith was involved in the crimes.  He maintained that there was evidence that Bennett had "acknowledged to two separate

11

individuals the active participation of [Smith] in the homicide" as well as evidence that Smith had "confessed his involvement in the murder of" Stewart. Thus, the defendant argued there was evidence of an "obvious connection" between Smith and the crimes and excluding such evidence would violate his state and federal constitutional rights to confrontation and cross-examination as well as his right to present all favorable proofs. See N.H. CONST. pt. I, art. 15; U.S. CONST. amends. V, VI, XIV.

The court held a hearing on the State's motion, at which it heard legal argument. At the hearing, the State again urged the court to apply Rule 404(b) to exclude evidence that Smith was an alternative perpetrator because there was no evidence of a connection between Smith and the crimes. The defendant countered that Rule 404(b) was inapplicable because the evidence he sought to admit was not "prior bad act evidence." Rather, the defendant asserted that there was evidence of a direct connection between Smith and the crimes in the form of statements from individuals who claimed that Bennett told them Smith was involved in the crimes and who claimed Smith himself said that he was involved in the crimes.

Following the hearing, the court issued an order granting the State's motion. The court ruled that there was no admissible evidence submitted regarding the incident involving Smith and a friend of Stewart, which the defendant had suggested gave rise to a motive for Smith to commit the crimes. The court further ruled that "statements of persons who [said] Bennett told them Smith was present during the homicide" were not relevant and, therefore, were inadmissible substantively. However, the court did not preclude the defendant "from cross-examining Bennett with his statements to others to the extent they are inconsistent with his testimony at trial," and reserved ruling "on whether the defendant may present extrinsic evidence of the statements in order to impeach Bennett by contradiction."

On appeal, the defendant argues that the trial court erred in excluding "evidence of an alternative perpetrator." He contends that, despite his "good faith showing that [Smith] may have been present at the time of the homicide, and evidence that Stewart had intervened in" a dispute between Smith and Stewart's friend, "the trial judge failed to address the question of nexus, and merely ruled that the evidence was not 'relevant' because none of the witness testimony described Smith as the person who stabbed Stewart." We disagree.

We have previously applied New Hampshire Rule of Evidence 404(b) to determine the admissibility of evidence of another person's other "bad acts" offered by the defendant to show that the person was an alternative perpetrator of the crimes. See State v. Roy, 167 N.H. 276, 290 (2015) (agreeing with trial court that Rule 404(b) applied to alternative perpetrator evidence at issue in that case); see also State v. Durgin, 165 N.H. 725, 729 (2013) (assuming, without deciding, that Rule 404(b) applies to alternative perpetrator evidence).

12

In Durgin, we stated that Rule 404(b) typically applies when the State seeks to introduce evidence of other bad acts of a defendant. Durgin, 165 N.H. at 730. We noted that, in such cases, evidence of other bad acts is admissible only "if relevant for a purpose other than to prove the defendant's character or disposition, if there is clear proof that the defendant committed the other acts, and if the prejudice to the defendant does not substantially outweigh the probative value of the evidence." Id. (quotation omitted). We explained that when a defendant seeks to introduce evidence of an alternative perpetrator, to meet the relevance requirement of Rule 404(b), the defendant must show a clear connection, i.e., a nexus, between the purposes for which he seeks to introduce the evidence and the person's other bad acts. See id.

Here, despite the defendant's representation to the contrary, the record reflects that the trial court addressed the question of nexus. The court ruled that evidence of the dispute between Smith and Stewart's friend had "an especially attenuated relationship to this case." The court found that, although the defendant argued that Stewart was a friend of the individual involved in the dispute, and that perhaps Stewart was killed as a result of that friendship, "[n]o admissible evidence was identified to support this theory." The court, therefore, ruled that "at this juncture the suggested evidence shall not be introduced." Thus, we reject the defendant's claim that the trial court failed to address the question of nexus.

We further find no error in the trial court's analysis and conclusion as to the Rule 404(b) issue. We agree with the trial court that the defendant failed to establish the requisite connection between the alleged prior dispute involving Smith and a friend of Stewart and Stewart's murder. Although evidence that Smith was involved in a dispute with Stewart's friend might suggest a motive to harm Stewart's friend, it does not establish that Smith had a motive to harm Stewart. See Durgin, 165 N.H. at 730-31.

The defendant further contends that the trial court erred in finding irrelevant the statements from individuals who claimed that Bennett told them Smith was present at the scene of the crimes. He maintains that evidence of "Smith's presence at the time of the stabbing would make it less probable that [the defendant] did the stabbing" and, thus, the court unsustainably exercised its discretion "in not allowing the alternative perpetrator evidence in the case in chief." At the hearing on the State's motion in limine, however, defense counsel stated that Bennett's statements placing Smith at the scene of the crimes also placed the defendant at the scene "participating in the actual homicide itself." He suggested that these statements were different from the statements Bennett made to the police and explained that he intended to introduce the statements to "challenge [Bennett's] change of story" and "undermine the entire State's theory." The court noted that the "statements would not be alternative perpetrator evidence because [Bennett was] not implicating Smith in the actual murder." Defense counsel responded that they

13

"would not be alternative -- I agree." Counsel stated that if he confronted Bennett with the statements, "the Court would then have to make a determination whether [the defense] would be allowed to introduce extrinsic proofs on it."

Subsequently, in its ruling, the court found that the statements did not tend "to exonerate the defendant by establishing Smith as an alternative perpetrator," but suggested, "that, if anything, Smith was an <u>additional</u> perpetrator, as an accomplice or coconspirator of the defendant." Thus, consistent with defense counsel's representations at the hearing, the court determined that the statements were not relevant as substantive evidence that Smith was an alternative perpetrator of the crimes. In addition, the court allowed the defendant to cross-examine "Bennett with his statements to others to the extent they are inconsistent with his testimony at trial," and reserved ruling "on whether the defendant may present extrinsic evidence of the statements in order to impeach Bennett by contradiction." In light of the fact that the court ruled consistently with defense counsel's representations at the hearing, the defendant cannot now complain of error. <u>Cf</u>. 5 C.J.S. <u>Appeal and Error</u> § 872, at 166 (2007) ("Under the doctrine of 'invited error,' an appellant may not complain on appeal that a court has granted the appellant's own request."); <u>cf</u>. <u>also</u> <u>State v. Goodale</u>, 144 N.H. 224, 227 (1999).

Moreover, to the extent that the defendant believed that the trial court misunderstood his argument and, therefore, improperly ruled that the statements were not relevant evidence of an alternative perpetrator, it was incumbent upon him to move for reconsideration. The trial court must have had the opportunity to consider any issues asserted by the defendant on appeal. <u>See</u> <u>State v. Mouser</u>, 168 N.H. 19, 27 (2015). The record on appeal does not demonstrate that the defendant sought reconsideration of the court's ruling or otherwise alerted the court to his view that the court erroneously ruled that statements made by Bennett placing Smith at the crime scene were irrelevant. <u>See</u> <u>id</u>.; <u>see</u> <u>also</u> <u>N.H. Dep't of Corrections v. Butland</u>, 147 N.H. 676, 679 (2002). We, therefore, decline to consider the argument on appeal.

The defendant also argues that his "inability to argue that [Smith] was present on the scene at the time of the stabbing, and [was] the perpetrator of the" stabbing, "impaired [his] ability to produce all proofs favorable in this matter, consistent with Part I, Article 15 of the New Hampshire Constitution." We disagree.

Under Part I, Article 15 of the New Hampshire Constitution, a defendant has the right to produce all proofs favorable to his defense. N.H. CONST. pt. I, art. 15; <u>see</u> <u>also</u> <u>State v. Newcomb</u>, 140 N.H. 72, 79 (1995). However, "[t]he right to produce all favorable proofs under Part I, Article 15 gives a defendant only the right to produce witnesses, not to produce their testimony." <u>State v. Mitchell</u>, 166 N.H. 288, 296 (2014) (quotation omitted). "Part I, Article 15 does

14

not entitle the defendant to introduce evidence in violation of the rules of evidence." Id. (quotation omitted); see also State v. Graf, 143 N.H. 294, 296, 297 (1999).

Here, the defendant does not contend that his right to produce witnesses was infringed; rather, he claims that he was unable to introduce, substantively, evidence suggesting that Smith was present at the crime scene. We note that, although the trial court did not allow the defendant to introduce Bennett's statements to others implicating Smith as substantive evidence, it did not preclude him from cross-examining Bennett about those statements to the extent that they were inconsistent with his trial testimony. At trial, the defendant did not cross-examine Bennett about such statements. Thus, we conclude that the trial court's refusal to allow evidence that Smith was present at the scene of the crimes did not violate his right to produce all favorable proofs.

III.    Expert Testimony on Footwear Impressions

The defendant next argues that the trial court erred in allowing the State's expert witness to testify that his shoes could have made footwear impressions found at the scene of the crimes. Expert testimony is admissible under New Hampshire Rule of Evidence 702 "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." N.H. R. Ev. 702. The condition that scientific, technical, or other specialized knowledge assist the trier of fact goes primarily to relevance. See United States v. Ford, 481 F.3d 215, 219 (3d Cir. 2007) (discussing similar language in Federal Rule of Evidence 702). "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 591 (1993) (quotation omitted).

The decision to admit expert testimony "rests, in the first instance, within the sound discretion of the trial court." State v. Dow, 168 N.H. 492, 501 (2016) (quotation omitted). We reverse its determination "only if the appealing party can demonstrate that the ruling was untenable or unreasonable and that the error prejudiced the party's case." Id. (quotation omitted).

Prior to trial, the defendant moved to exclude expert testimony that certain footwear impressions found at the scene could have been made by a specified footwear. He contended that the technique employed by the footwear identification examiner was unreliable and that the examiner's opinion would not be helpful to the jury because she was not able to positively identify the footwear as the source of any impression. Following a hearing, the trial court denied the motion, ruling that the methodology employed by the examiner was reliable and that the testimony "qualifies as a piece of circumstantial evidence,

which[,] in conjunction with other evidence[,] will be of assistance to the jury in determining who was present at the scene of the crime."

At the hearing, Emily Rice, a level II criminalist in the identification unit of the New Hampshire State Police Forensic Laboratory, testified regarding footwear comparison. She stated that footwear comparison involves comparing an unknown footwear impression to the outsoles of known footwear and rendering a conclusion about whether the known footwear is the source of the unknown impression. She stated that, in rendering those conclusions, she relies upon what is known as "class characteristics" and "individual characteristics." "[C]lass characteristics" are features that are "shared by two or more items of footwear" that can be used to "eliminate a large number of shoes as having made an impression." "[I]ndividual characteristics" are those "accidental, random characteristics" that can be used to separate "items from other items in the same class."

Rice testified that, in this case, she examined two different known shoes as well as unknown crime scene prints. She stated that she was not able to "assess any individual characteristics" in the crime scene prints. She agreed with defense counsel that her conclusion in this case with respect to the known shoes was that "they could have produced the" crime scene prints. She further agreed that, based upon her comparisons, her conclusion was that there was "a significant association of class characteristics."

It is undisputed on appeal that one of the known shoes examined by Rice was the defendant's. The defendant contends that, because the expert could not conclusively identify his shoes as the cause of the footwear impressions, her testimony was of little assistance to the jury and should not have been allowed. We disagree. The overall purpose of Rule 702 is to ensure that a fact-finder is presented with reliable and relevant evidence, not flawless evidence. State v. Langill, 157 N.H. 77, 87 (2008). "[A]n expert need not have an opinion on the ultimate question to be resolved to satisfy the relevance requirement." United States v. Allen, 390 F.3d 944, 949 (7th Cir. 2004) (quotation omitted). Questions about the weight and credibility of expert testimony are left to the fact finders. See State v. Whittaker, 158 N.H. 762, 773 (2009) ("Provided that the trial court finds that the expert's methodology is reliable, it is up to the fact finder to determine the weight and credibility to be accorded the expert's testimony."); see also Baker Valley Lumber v. Ingersoll-Rand, 148 N.H. 609, 615-16 (2002).

Here, it was highly relevant that the defendant's shoes contained a "significant association of class characteristics" to the impressions at the crime scene. Whether the defendant's shoes could have made the impressions found at the scene of the crimes was probative of the defendant's participation in the crimes. What Rice brought to the case that a lay jury could not was her general knowledge of footwear comparisons, and her ability to examine the

16

known and unknown shoeprints and identify any similar characteristics. Thus, Rice's testimony that the shoes could have made the questioned impressions at the crime scene was relevant evidence because it made a fact of consequence more probable than it would be without the evidence. See N.H. R. Ev. 401. We conclude, therefore, that expert testimony on this issue satisfied the purpose of Rule 702 by providing evidence that could "assist the trier of fact to understand the evidence or to determine a fact in issue." N.H. R. Ev. 702.

Our conclusion is consistent with the decisions of courts in other jurisdictions. See Ford, 481 F.3d at 218, 218-20 (concluding that district court properly found that expert shoeprint testimony that defendant's shoes could not be ruled out as source of prints in question "would aid the jury in making comparisons between the soles of shoes found on or with the defendant and the imprints of soles found on surfaces at the crime scene"); United States v. Lloyd, 462 F.3d 510, 517 (6th Cir. 2006) (concluding that, despite fact that expert did not identify shoeprint as definitely matching defendant's shoe, probative value of shoeprint evidence was high where defendant was arrested a short distance from crime scene wearing shoes with same tread design and dimensions of shoeprint left by suspect at crime scene); People v. Henne, 518 N.E.2d 1276, 1282 (Ill. App. Ct. 1988) ("[T]he fact that defendant's boots, which he admits wearing [on the night of the crime] could have made the print is relevant.").

We conclude that the defendant has not demonstrated that the trial court's decision to allow Rice's testimony was untenable or unreasonable to the prejudice of his case. Accordingly, we hold that the trial court did not unsustainably exercise its discretion by admitting it.

Finally, any issues raised in the defendant's notice of appeal that he has not briefed are deemed waived. See State v. Blackmer, 149 N.H. 47, 49 (2003).

Affirmed.

DALIANIS, C.J., and HICKS, LYNN, and BASSETT, JJ., concurred.

17