NOTICE: This opinion is subject to motions for rehearing under Rule 22 as well as formal revision before publication in the New Hampshire Reports. Readers are requested to notify the Reporter, Supreme Court of New Hampshire, One Charles Doe Drive, Concord, New Hampshire 03301, of any editorial errors in order that corrections may be made before the opinion goes to press. Errors may be reported by email at the following address: reporter@courts.state.nh.us. Opinions are available on the Internet by 9:00 a.m. on the morning of their release. The direct address of the court's home page is: https://www.courts.nh.gov/our-courts/supreme-court

THE SUPREME COURT OF NEW HAMPSHIRE

_____

Belknap

Case No. 2023-0138

Citation: State v. Keller, 2024 N.H. 42

THE STATE OF NEW HAMPSHIRE

v.

OTTO KELLER

Argued: June 13, 2024
Opinion Issued: August 14, 2024

John M. Formella, attorney general, and Anthony J. Galdieri, solicitor general (Sam M. Gonyea, assistant attorney general, on the brief and orally), for the State.

Pamela E. Phelan, senior assistant appellate defender, of Concord, on the brief, and Kirkland & Ellis LLP, of Chicago, Illinois (Helen E. Witt on the brief and orally), for the defendant.

DONOVAN, J.

[¶1] The defendant, Otto Keller, appeals a decision from Superior Court (O'Neill, J.) denying his motion in limine and allowing the testimony of Colleen

Scarneo, the State's expert on "human performance forensic toxicology," and a decision from Superior Court (Attorri, J.) denying his motion to dismiss his conviction on one count of aggravated driving while intoxicated (ADWI) for causing a collision resulting in serious bodily injury. See RSA 265-A:3, I(b) (2024). The defendant argues that: (1) the methodology that Scarneo used was not sufficiently reliable to meet the requirements for admission; and (2) the evidence was insufficient to prove the required element of serious bodily injury. We conclude that the trial court erred in admitting Scarneo's testimony because the methodology that she used was not sufficiently reliable to meet the requirements for admission, and that such testimony prejudiced the outcome of the case. We also conclude that the evidence was insufficient to prove serious bodily injury. Accordingly, we reverse the defendant's ADWI conviction and remand for proceedings consistent with this opinion.

## I. Facts

[¶2] The jury could have found the following facts. Shortly after 1:00 a.m. on September 1, 2018, the defendant fell asleep while driving, drove his car over the center line into the oncoming lane of traffic, and crashed into an unoccupied car and the side of a house on the opposite side of the road about 1,000 feet from his house. After the crash, the defendant returned to his residence, and his girlfriend took him to the hospital. His girlfriend called the police and reported the crash.

[¶3] Officer McCormack spoke with the defendant at the hospital approximately forty minutes after the crash while another officer, Officer Goodheart, investigated the crash scene. McCormack did not observe any signs of impairment, such as bloodshot or watery eyes, slurred speech, or an odor of alcohol. The defendant told McCormack that he had used heroin that evening, approximately five hours before the crash, and that he was involved in a methadone clinic. The officer recalled that the defendant also told him "that he had been involved in a car crash and had some serious injuries regarding that." The defendant consented to a blood draw, which revealed acetyl fentanyl, norfentanyl, fentanyl, methadone, methamphetamine, and amphetamine in his system.

[¶4] Several days after the crash, Officer Goodheart contacted the defendant and asked him to speak to her about the incident. The defendant agreed, and the officer subsequently met with him at the defendant's residence. When the officer arrived at the defendant's home, she noticed that his arm was in a sling. The defendant told the officer that, as a result of the crash, he had sustained "a few small lacerations to the top of his head, but his only significant injury was the broken right humerus." Although the defendant admitted that he had used heroin, fentanyl, or a combination thereof at least four hours prior to the accident, and that he fell asleep or passed out while

2

behind the wheel when he left his home at approximately 1:00 a.m., he maintained that his substance misuse did not contribute to the crash.

[¶5] The defendant was charged with ADWI in violation of RSA 265-A:3, I(b). The State identified Scarneo as an expert witness in human performance forensic toxicology. According to her expert witness disclosure, Scarneo anticipated testifying about the "the pharmacological and toxicological effects associated with the drugs found in [the defendant's] blood when used alone and concomitantly, as well as their effects on driving." Scarneo also anticipated opining that the defendant "demonstrated signs and symptoms of impairment that are consistent with the acute effects of acetyl fentanyl and fentanyl combined with the withdrawal effects from methamphetamine and cocaine use" and that "this combination of effects would impair a person's ability to stay alert or awake, concentrate on the road and maintain control of their vehicle while driving."

[¶6] The defendant moved in limine to preclude Scarneo's testimony, arguing that her "proposed testimony is not the product of reliable methods." The defendant argued, inter alia, that Scarneo's methodology was unreliable because it did not satisfy the four factors set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-94 (1993), and codified in RSA 516:29-a, II (2021), and, therefore, her testimony was inadmissible under New Hampshire Rule of Evidence 702. See State v. Langill, 157 N.H. 77, 85 (2008). The State objected.

[¶7] The court held a two-day hearing in September and December 2021 on the defendant's motion. Scarneo testified that she had been running her own forensic toxicology consulting business for about one year, prior to which she worked in the state forensic toxicology laboratory as a forensic toxicologist. Scarneo testified that while working at the state laboratory, she performed blood tests, interpreted the results of blood tests indicating the presence of drugs in a person's system, and opined as to whether the person exhibited signs and symptoms of impairment consistent with the drugs found in the person's blood. To formulate an opinion, Scarneo testified that she reviews a variety of information, including the blood test results, information about the blood collection, discovery materials related to the individual and the incident, information about the drugs found in the person's body, and any relevant literature, while drawing upon her own education, training, and experience. Scarneo's work culminates in a report that details her findings and ultimate opinion. Scarneo also testified as to whether the methodology that she uses to formulate her opinion can be tested, has been peer reviewed, has a potential error rate, and is widely accepted. See RSA 516:29-a, II(a) (setting forth factors courts shall consider when determining the admissibility of an expert's opinion).

3

[¶8] Regarding the defendant's case, Scarneo testified that she reviewed three different police reports, including reports written by McCormack and Goodheart, a witness statement from the defendant's girlfriend, the defendant's medical records, and the results from the blood sample taken from the defendant on the night of the crash. She also provided a synopsis of each drug identified in the defendant's system, which included the adverse effects each drug is known to cause, the potential for impairment of driving, and the history of the defendant's use of that drug.

[¶9] In January 2022, the court denied the defendant's motion, finding Scarneo's testimony reliable under RSA 516:29-a (2021) and Daubert. The court found State v. Kelley, No. 09-CR-1051, at 3-7 (N.H. Super. Ct., Merrimack Cnty. Jan. 4, 2011), "particularly persuasive" because Kelley "involved identical challenges to Ms. Scarneo's testimony," and the Kelley court found Scarneo's testimony reliable. The court incorporated the reasoning set forth in Kelley and did not conduct its own analysis as to whether, in this case, Scarneo's methodology satisfied the factors laid out in RSA 516:29-a and Daubert.

[¶10] In November 2022, the court held a two-day jury trial. The State's witnesses included McCormack and Goodheart, as well as three experts who testified about the results of the blood tests that they conducted on the defendant's blood sample — none of whom could determine whether, based upon the test results alone, the defendant was impaired at the time of the crash. The State also called Scarneo, who was qualified as an expert in "human performance forensic toxicology." When the court qualified her as an expert, the defense renewed its objection regarding Scarneo's testimony.

[¶11] Similar to her testimony at the motion hearing, Scarneo described the methodology that she used when interpreting laboratory results to determine whether someone was impaired. Regarding the defendant's case, Scarneo specified what information she reviewed to formulate her opinion, provided an overview of each drug found in the defendant's blood, and discussed the results of the defendant's blood tests. Scarneo testified that, based upon this review, it was her opinion that the defendant exhibited signs and symptoms of impairment consistent with the ingestion of the drugs found in his blood.

[¶12] At the close of the State's case, the defendant moved to dismiss, arguing, as relevant to this appeal, that there was insufficient evidence of impairment and serious bodily injury. As part of his motion to dismiss for insufficient evidence of impairment, the defendant again raised issues with Scarneo's methodology and renewed his motion to exclude her testimony. The defendant also requested that, if the court denied the motion to dismiss for insufficient evidence of serious bodily injury, it provide the jury with instructions on the lesser-included offense of driving under the influence of

4

drugs or alcohol (DWI). See RSA 265-A:2, I(a) (2024). The court denied the defendant's motion to dismiss on both grounds, but instructed the jury on the lesser-included offense. The jury found the defendant guilty of ADWI. This appeal followed.

## II. Analysis

### A. Sufficiency of the Evidence

[¶13] We first address the defendant's argument that the trial court erred when it denied his motion to dismiss the ADWI charge for insufficient evidence of a serious bodily injury. See RSA 265-A:3, I(b). A challenge to the sufficiency of the evidence raises a claim of legal error; therefore, our standard of review is de novo. State v. Folley, 172 N.H. 760, 766 (2020). When considering such a challenge, we objectively review the entire record, including any evidence presented by the defendant, to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, considering all the evidence and all reasonable inferences drawn therefrom in the light most favorable to the State. Id. We examine each evidentiary item in the context of all the evidence, and not in isolation. Id.

[¶14] As relevant to this case, a person is guilty of ADWI when that person "drives or attempts to drive a vehicle upon any way":

> I. While under the influence of intoxicating liquor or any controlled drug, prescription drug, over-the-counter drug, or any other chemical substance, natural or synthetic, which impairs a person's ability to drive or any combination of intoxicating liquor and controlled drug or drugs, prescription drug or drugs, over-the-counter drug or drugs, or any other chemical substance or substances, natural or synthetic, which impair a person's ability to drive and, at the time alleged:
>
> . . .
>
> (b) Causes a motor vehicle, boating, or OHRV collision resulting in serious bodily injury, as defined in RSA 625:11, VI, to the person or another; . . . .

RSA 265-A:3 (2024) (emphasis added).

[¶15] RSA 625:11, VI (2016) defines "serious bodily injury" as "any harm to the body which causes severe, permanent or protracted loss of or impairment to the health or of the function of any part of the body." The indictment in this case alleged that the collision resulted in serious bodily injury to the defendant, specifically "a broken right humerus."

5

[¶16]  After reviewing the record, we conclude that the evidence is insufficient to prove, beyond a reasonable doubt, that the defendant sustained a serious bodily injury.  McCormack testified that when he spoke with the defendant at the hospital on the night of the crash, the defendant told the officer "that he had been involved in a car crash and had some serious injuries regarding that."  Goodheart testified that when she went to the defendant's home several days after the crash, she noticed that the defendant's arm was in a sling.  Goodheart also testified that the defendant told her that he sustained "a few small lacerations to the top of his head, but his only significant injury was the broken right humerus."

[¶17]  The fact that the defendant sustained a broken arm does not, in and of itself, prove that the defendant sustained "severe, permanent or protracted loss of or impairment to the health or of the function of any part of the body."  RSA 625:11, VI.  The jury was not presented with any evidence as to what type of break the defendant suffered, the severity of the break, or how the broken arm would or did impact the defendant's health or ability to function.  The fact that Goodheart noticed that the defendant's arm was in a sling established only that, at a single point in time several days after the accident, the defendant's arm was in a sling — not that the injury was "severe, permanent or protracted."  Id.  Based upon the record before us, we conclude that a rational trier of fact could not have found the element of serious bodily injury beyond a reasonable doubt, even when considering all the evidence and all reasonable inferences drawn therefrom in the light most favorable to the State.  Accordingly, the trial court erred in denying the defendant's motion to dismiss the ADWI charge, and we reverse the defendant's conviction.

B.  Admissibility of Expert Witness's Testimony

[¶18]  We next address the defendant's argument that the trial court erred in denying his motion in limine and admitting Scarneo's testimony.  The defendant contends that the methodology that Scarneo used to formulate her opinion that the defendant "exhibited 'signs and symptoms' 'consistent' with drug impairment . . . was inherently unreliable" in violation of Daubert and RSA 516:29-a, II(a).  The State disagrees, arguing that the court did not err in admitting Scarneo's testimony because her methodology satisfied three out of the four criteria set forth in RSA 516:29-a, II(a) and, therefore, her "opinion was the product of a reliable methodology."  We agree with the defendant.

[¶19]  New Hampshire Rule of Evidence 702 authorizes the trial court to admit expert testimony.  Moscicki v. Leno, 173 N.H. 121, 124 (2020).  To be admissible, however, expert testimony must cross a threshold of reliability.  Id.  To determine the reliability of expert testimony, the trial court must apply RSA 516:29-a.  Id.  Section II of RSA 516:29-a codifies the four Daubert factors we applied in Baker Valley Lumber v. Ingersoll-Rand, 148 N.H. 609, 614, 616 (2002).  Langill, 157 N.H. at 85; see also Daubert, 509 U.S. at 593-94.

6

[¶20] RSA 516:29-a provides:

> I.  A witness shall not be allowed to offer expert testimony unless the court finds:
>
> > (a) Such testimony is based upon sufficient facts or data;
> > (b) Such testimony is the product of reliable principles and methods; and
> > (c) The witness has applied the principles and methods reliably to the facts of the case.
>
> II. (a) In evaluating the basis for the proffered expert testimony, the court shall consider, if appropriate to the circumstances, whether the expert's opinions were supported by theories or techniques that:
>
> > (1) Have been or can be tested;
> > (2) Have been subjected to peer review and publication;
> > (3) Have a known or potential rate of error; and
> > (4) Are generally accepted in the appropriate scientific literature.
>
> > (b) In making its findings, the court may consider other factors specific to the proffered testimony.

[¶21] When applying these factors, the trial court "functions only as a gatekeeper, ensuring a methodology's reliability before permitting the fact-finder to determine the weight and credibility to be afforded an expert's testimony." Moscicki, 173 N.H. at 124-25 (quotation omitted). Although the proponent of expert testimony bears the burden of proving its admissibility, the burden is not especially onerous because "Rule 702 has been interpreted liberally in favor of the admission of expert testimony." Id. at 125 (quotation omitted). Indeed, the overall purpose of Rule 702 and RSA 516:29-a is to ensure that a fact-finder is presented with reliable and relevant evidence, not flawless evidence. Id. Thus, as long as an expert's scientific testimony rests upon reliable grounds, it should be tested by the adversary process, rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies. Id.

[¶22] The decision to admit expert testimony rests, in the first instance, within the sound discretion of the trial court. State v. Gay, 169 N.H. 232, 249 (2016). We will reverse the trial court's ruling only if the defendant demonstrates that it was untenable or unreasonable to the prejudice of his case. Id. at 250; see also Szewczyk v. Continental Paving, 176 N.H. 148, 156 (2023). When applying this standard, "[o]ur task is not to determine whether we would have found differently, but only to determine whether a reasonable person could have reached the same decision as the trial court on the basis of the evidence before it." Szewczyk, 176 N.H. at 156 (quotations omitted).

[¶23] The first factor that a court must consider when "evaluating the basis for proffered expert testimony" is whether the "expert's opinions were supported by theories or techniques that . . . [h]ave been or can be tested."

RSA 516:29-a, II(a). The trial court incorporated the reasoning set forth in Kelley, which explained that Scarneo's methodology satisfied the first Daubert factor because Scarneo had "attended seminars and written articles on toxicology as it applies to drivers under the influence of drugs." The Kelley court also reasoned that in formulating her opinion, Scarneo relied on test results and statements by arresting officers and witnesses as well as her own "extensive knowledge and experience in forensic toxicology." Even if we assume that these facts are supported by the record in this case, they do not establish the reliability of the specific methodology Scarneo employs or that it has been tested, but, rather, go to her experience and education in forensic toxicology and explain how she reaches her final conclusion.

[¶24] At the hearing on the motion in limine, Scarneo expressly stated that her methodology had not been tested, and we are not persuaded that the evidence in the record demonstrates that Scarneo's methodology can be tested. See RSA 516:29-a, II(a)(1). Scarneo's methodology, as best we can discern, is that she reviews a variety of information, including discovery materials, blood test results, and blood sample collection information, and then, relying on her experience, training, and education, evaluates this information in order to determine whether an individual exhibited signs and symptoms of impairment. The information she reviews varies in any given case.

[¶25] When reviewing this information, Scarneo does not utilize any type of standardized assessment tool. See State v. Cressey, 137 N.H. 402, 408-09 (1993) (concluding that the expert's methodology was not reliable, in part because the evaluative techniques that the expert used to formulate her opinion did not utilize standardized tests, and the results of the evaluations did not produce "quantifiable results that could then be compared to a standardized norm"); cf. Baxter v. Temple, 157 N.H. 280, 299 (2008) (concluding that the expert's methodology was reliable, in part because it utilized a series of standardized assessments, all of which had been tested); State v. Dahood, 148 N.H. 723, 730-31 (2002) (concluding that a specific field sobriety test can and has been tested because several studies had been conducted regarding the test's accuracy). Rather, Scarneo agreed with defense counsel that the "interpretation and formation of [her] opinion happens in [her] mind." See Cressey, 137 N.H. at 410 (expressing concern that the expert's "interpretation and evaluation of the available information is somewhat subjective" and that the "final interpretive step occurs in [the expert's] mind, drawing on her experiences and personal knowledge"). Although Scarneo testified that her methodology could be tested by having someone else review the same materials and then "come up with their independent opinion," that rationale merely assesses the outcome in the individual case and does not examine the reliability of the methodology itself.

[¶26] Such a methodology is essentially immune to cross-examination, as an expert "may candidly acknowledge any inconsistencies or potential

8

shortcomings in the individual pieces of evidence she presents, but can easily dismiss the critique by saying that her evaluation relies on no one symptom or indicator and that her conclusions still hold true in light of all the other available factors and her expertise in the field." Id. Indeed, such a scenario occurred during Scarneo's cross-examination when she admitted that she disregarded McCormack's assessment that the defendant did not exhibit signs of impairment because she did not know the officer and she assumed, without confirming, that the officer was looking exclusively for signs of alcohol impairment.

[¶27] The second factor that a court must consider is whether the expert's methodology has "been subjected to peer review and publication." RSA 516:29-a, II(a)(2). The trial court in Kelley found that the record supported a finding that Scarneo's methods had been subjected to peer review because she had attended conferences and continuing education classes on the effects of alcohol and drugs on human performance and behavior, and because the "study of the effects of drugs on human behavior is not a new concept." This evidence, however, does not demonstrate whether Scarneo's methodology has been subjected to peer review. Moreover, the fact that the record in Kelley supported a finding that Scarneo's work had been peer reviewed does not necessarily mean that the record in this case supported the same finding.

[¶28] In reviewing the record in this case, evidence that the methodology that Scarneo uses has been subjected to peer review and publication is lacking. We recognize that Scarneo testified that she uses a methodology "that has been accepted and published in peer-review journals, as well as scientific books," and that certain studies and publications have recommended information to consider when conducting this type of interpretive work in order to render an opinion on impairment. Such testimony, however, does not directly address whether the specific methodology she employs has been subjected to peer review. Moreover, Scarneo did not identify, either during her testimony or in her expert witness disclosure, any specific study, work, or peer that has reviewed the methodology that she uses, which could have assisted us in determining whether her methodology is reliable. Cf. Dahood, 148 N.H. at 730-31 (discussing the studies, reports, and "'extensive scientific literature'" that examines and critiques a certain field sobriety test in determining whether the test has been subjected to peer review and publication). Additionally, Scarneo testified that, although her colleagues reviewed the reports that she generated, she was the only one in the state laboratory who could apply her methodology and engage in this type of interpretive work.

[¶29] Third, a court must consider whether the expert's "theories or techniques . . . [h]ave a known or potential rate of error." RSA 516:29-a, II(a). The trial court in Kelley explained that there are known error rates for the laboratory results, but that unlike alcohol, there is no per se rule of impairment for prescription drugs. The court also recognized that a

9

methodology can still be reliable even if it fails to meet one or more of the Daubert factors. Although the record in this case includes these same considerations that the Kelley court identified, they do not establish that there is an error rate for the specific methodology that Scarneo applied. In fact, Scarneo testified that, regarding her ultimate opinion as to whether an individual exhibits signs and symptoms of impairment, there is no confidence interval, range of uncertainty, or error rate for the underlying methodology, and that while working at the state laboratory, she was never told that her ultimate conclusion was incorrect.

[¶30] The State recognizes that "Scarneo's methodology did not have a known or potential error rate," but argues that this factor was "not 'appropriate to the circumstances' of this case given the nature of Scarneo's analysis." (Quoting RSA 516:29-a, II(a).) Although "a methodology may be reliable even if it fails to meet one or more of [the Daubert] factors," Baker Valley Lumber, 148 N.H. at 616, the State must still prove that the expert's testimony is "the product of reliable principles and methods," RSA 516:29-a, I(b).

[¶31] Finally, a court must consider whether the expert's "theories or techniques . . . [a]re generally accepted in the appropriate scientific literature." RSA 516:29-a, II(a). The Kelley court found that this factor was satisfied because "the known side effects of drugs have such widespread and general acceptance with the [scientific] community." (Quotation omitted.) The fact that it is generally accepted that drugs have known side effects, however, does not prove that Scarneo's methodology is itself generally accepted.

[¶32] Here, Scarneo testified that her methodology is "a generally accepted methodology among the scientific community." She also explained that there is "nothing new, novel, or unique" about the methodology she employs, and that most forensic toxicologists working in a forensic laboratory would employ the same methodology. However, at the time that Scarneo was working on the defendant's case, she was the only person at the state laboratory capable of applying this methodology. Moreover, Scarneo testified that there are no generally accepted standards governing her interpretive methodology, no generally accepted level of training or experience to qualify someone to use her method, and no certification that someone must receive or test that someone must pass to be qualified to conduct Scarneo's type of interpretive work. Accordingly, for the reasons stated above, we conclude that the trial court unsustainably exercised its discretion in ruling that Scarneo's methodology is reliable and, therefore, erred in allowing her to opine that the defendant "demonstrated signs and symptoms of impairment that are consistent with" the use of drugs found in his system, which could have impaired his driving.

[¶33] Given this conclusion, we next consider whether this error prejudiced the defendant's case. See Gay, 169 N.H. at 250 ("We reverse [a trial

court's] determination 'only if the appealing party can demonstrate that the ruling was untenable or unreasonable and that the error prejudiced the party's case.'"). We first note that although the defendant objected to the entirety of Scarneo's testimony in his motion in limine, the arguments raised in the motion and on appeal focus on Scarneo's anticipated opinion testimony that the defendant exhibited signs and symptoms consistent with impairment. In her expert witness disclosure, however, Scarneo also anticipated that her testimony would "include explaining the pharmacological and toxicological effects associated with the drugs found in [the defendant's] blood when used alone and concomitantly, as well as their effects on driving." In both the motion in limine and the current appeal, the defendant does not appear to address or object to this portion of the expert's testimony. In fact, at oral argument, defense counsel agreed that expert testimony is likely admissible if limited to the effects that certain drugs have on a person, and clarified that the defendant did not object to Scarneo's testimony that focused primarily on the general toxicological effects of certain drugs.

[¶34] We need not decide which portions of Scarneo's testimony were inadmissible, however, because her ultimate opinion that the defendant "demonstrated signs and symptoms of impairment that are consistent with" the use of drugs found in his system, which we have concluded was inadmissible given that the underlying methodology was unreliable, prejudiced the outcome of the case. Twice during her testimony, Scarneo offered her opinion that the defendant exhibited signs and symptoms of impairment consistent with the use of the drugs found in his system that could impair his driving. Her ultimate opinion, which could not be adequately challenged for the reasons we have already outlined, essentially established the impairment element of both the ADWI charge and the lesser-included DWI offense. See RSA 265-A:2, I(a); RSA 265-A:3, I(b); Cressey, 137 N.H. at 411 (holding that the expert's opinion affected the verdict because it was "lengthy, comprehensive, and directly linked to a determination of the guilt or innocence of the defendant"). "[A] jury may attach extra importance to an expert's opinion simply because it is given with the air of authority that commonly accompanies an expert's testimony." Cressey, 137 N.H. at 405. Accordingly, we conclude that admission of Scarneo's ultimate opinion was prejudicial to the defendant's case.

### III.   Conclusion

[¶35] For the foregoing reasons, we conclude that the trial court erred in denying the defendant's motion to dismiss the ADWI charge, and we reverse the defendant's conviction. Additionally, we conclude that the trial court erred in denying the defendant's motion in limine and admitting Scarneo's ultimate opinion. In a supplemental brief filed with this court, the defendant agreed that if we reverse the ADWI conviction on the ground of insufficient evidence of serious bodily injury and rule that testimony of the State's expert was

11

inadmissible, then the proper remedy would be to remand for a new trial on the lesser-included charge of DWI. Accordingly, we remand the lesser-included DWI charge for proceedings consistent with this opinion.

<u>Reversed and remanded</u>.

MACDONALD, C.J., and BASSETT and COUNTWAY, JJ., concurred.